[No. G011685. Fourth Dist., Div. Three. May 28, 1992.]

ASCENSION BRISENO, Plaintiff and Appellant, v.
CITY OF SANTA ANA, Defendant and Respondent.

COUNSEL

Richard L. Spix for Plaintiff and Appellant.

Kenneth Kobrin, Ronald S. Javor, David T. Quezada and Rob Brian Rank as Amici Curiae on behalf of Plaintiff and Appellant.

Edward J. Cooper, City Attorney, and Robert J. Wheeler, Assistant City Attorney, for Defendant and Respondent.

OPINION

SILLS, P. J.—Under the Uniform Housing Code, adopted pursuant to Health and Safety Code section 17922, subdivision (a)(1), every dwelling unit in this state is required to have at least 1 room with a minimum of 120 square feet of floor area; other habitable rooms are required to have an area of at least 70 square feet; and in any room used for sleeping purposes, "the

required floor area shall be increased at the rate of 50 square feet for each occupant in excess of two." (Uniform Housing Code, § 503, subd. (b) [hereafter referred to as section 503].) So far, so good.

Respondent City of Santa Ana (the City), however, thinks those dimensions are too small and lead to overcrowding. It therefore passed an ordinance (No. NS-2126) increasing the minimum size of the largest room to 150 square feet (a 30-sq.-ft. increase), and requiring 100 square feet for each additional occupant (a 50-sq.-ft. increase). For appellant Ascension Briseno, the new ordinance spelled disaster. Under the Uniform Housing Code, the Briseno family of five could legally dwell in the one-bedroom apartment where they have long resided; under the City's new ordinance, either one family member would have to leave or the whole family would have to move.

There is no question that the City (or any other municipality in this state) has the power to enact occupancy standards which differ from those set forth in the Uniform Housing Code. The applicable statutes, however, set up a specific procedure to accomplish such local regulation, and the City simply did not comply with those provisions. For the reasons that follow, we hold the City's ordinance invalid, and reverse the judgment.

FACTS

These parties have visited us before. In 1987, the City issued a notice of violation to Briseno concerning the same apartment at issue here. The City claimed the Briseno family was in violation of section 503, the same provision quoted above. The City interpreted the code term "habitable room" to include only bedrooms, not living rooms; under that interpretation, Briseno could have only three people living in his apartment, not five. Briseno obtained a preliminary injunction restraining the enforcement of the City's interpretation of the Uniform Housing Code, and we affirmed. (*Briseno* v. *City of Santa Ana* (Dec. 21, 1989) G007152 [nonpub. opn.].) We observed that the City appeared "to have little support for its attempt to narrow the meaning of 'habitable rooms' to so-called 'bedrooms.'" On remand, a permanent injunction was issued restraining the City from further prosecutions under its interpretation of the Uniform Housing Code.

The City remained undaunted; on May 6, 1991, its city council adopted ordinance No. NS-2126. Section 1, subdivision (c) of the ordinance provides: "No dwelling unit shall be inhabited in such a manner that it exceeds the maximum occupancy of the dwelling unit. [¶] Maximum occupancy shall be determined as follows: [¶] For the first two (2) occupants, [*sic*] of any

dwelling unit, there shall be at least one hundred fifty (150) square feet of net floor space. There shall be at least one hundred (100) square feet of net floor space for every additional occupant thereafter." The City made no findings regarding local climatic, geological, or topographical conditions;[1] the ordinance merely stated in general terms that overcrowding increases noise pollution, traffic congestion, unsanitary conditions, and the like. (No. NS-2126, § 1, subd. (a).)

The parties agree that, under the City's ordinance, no more than four people would be permitted to live in the Briseno apartment. At the city council hearing prior to the adoption of the ordinance, evidence was presented that the average occupancy for one-bedroom apartments in Briseno's neighborhood is five to six people; the average occupancy for two-bedroom units is eight to nine people. Evidence was also presented that at least half the families living in the general area would be subject to eviction.

Less than one month after the ordinance became effective, Briseno filed a complaint for declaratory and injunctive relief. He claimed the ordinance was invalid for a variety of reasons. By the time the case proceeded to trial, however, the sole issue was whether state law preempted local ordinances regarding occupancy standards. The trial court found there was no such preemption. Although the judgment itself is silent as to the trial court's rationale, and the trial transcript is not entirely clear, it appears the court found section 503 unconstitutional by virtue of our Supreme Court's decision in *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]. In light of this finding of unconstitutionality, the trial court agreed with the City that local entities are free to legislate their own occupancy standards. Briseno appealed; we granted his petition for writ of supersedeas to stay enforcement of the ordinance during the pendency of this appeal. (*Briseno* v. *Superior Court* (Nov. 15, 1991) G011669.)

DISCUSSION

I

■ The Uniform Housing Code was adopted into state law pursuant to Health and Safety Code section 17922. We must first decide whether the Legislature has expressed its intent, through the adoption of the Uniform Housing Code to occupy the field of occupancy standards; i.e., does the

---

[1]The phrase "local climatic, geological, or topographical conditions" emanates from Health and Safety Code section 17958.5, subdivision (a); the applicability of this statute will be discussed later in this opinion. Unless otherwise indicated, all statutory references are to the Health and Safety Code.

Uniform Housing Code preempt local occupancy ordinances generally? We believe it does. Division 13 of the Health and Safety Code deals with housing; part 1.5 of that division concerns the regulation of buildings used for human habitation. Section 17922, which adopts the Uniform Housing Code, is found in part 1.5, as is section 17950, which provides: "The provisions of this part, the building standards published in the State Building Standards Code, or the other rules and regulations promulgated pursuant to the provisions of this part which relate to apartment houses . . . and dwellings, . . . *apply in all parts of the state.*" (Italics added.)

One need only track the history of the state's housing laws to appreciate the Legislature's desire to preempt local regulation generally. Under the original version of section 17951, subdivision (a), counties and municipalities were free to "enact ordinances or regulations imposing restrictions equal to or greater than those imposed" by part 1.5 (including, presumably, the Uniform Housing Code). Thus, prior to 1970, state building and housing requirements did not preempt the field. (See *City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 100-101 [48 Cal.Rptr. 889, 410 P.2d 393].) Amendments passed in 1970 to pertinent parts of the Health and Safety Code, however, changed all that. "In 1970, the Legislature amended section 17951 by deleting the provision authorizing local agencies to adopt ordinances imposing standards 'equal to or greater' than those promulgated by the state, repealed section 19825 and made other substantial revisions in the State Housing Law. [Citation.] The revisions directed [the state] to adopt rules and regulations imposing 'the same requirements' as are contained in the various uniform building codes . . . and required every city and county to adopt ordinances or regulations imposing the same requirements . . . ." (*Baum Electric Co.* v. *City of Huntington Beach* (1973) 33 Cal.App.3d 573, 577 [109 Cal.Rptr. 260].)[2] It is clear that the 1970 amendments to the state housing laws evidence a legislative intent to generally preempt local regulation in the field. The court in *Danville Fire Protection Dist.* v. *Duffel Financial & Constr. Co.* (1976) 58 Cal.App.3d 241, 248 [129 Cal.Rptr. 882], reached the identical conclusion.

We also agree with amicus curiae (the state's Department of Housing and Community Development) that the Legislature has also *impliedly* preempted most local regulations, because it has prescribed the manner in which local authorities can adopt ordinances which vary from the uniform codes. Section

---

[2]The *Baum* opinion also cited to a legislative declaration accompanying the 1970 amendments, which stated that " 'uniformity of codes throughout the State . . . is a matter of satewide [*sic*] interest and concern since it would reduce housing costs and increase the efficiency of private housing construction industry and its production.' " (*Baum, supra*, 33 Cal.App.3d at p. 578, quoting Stats. 1970, ch. 1436, § 7.)

17958.5, subdivision (a) provides in pertinent part that "a city or county may make such changes or modifications in the requirements contained in the provisions published in the California Building Standards Code and the other regulations adopted pursuant to Section 17922 [i.e., the Uniform Housing Code] as it determines, pursuant to the provisions of Section 17958.7, are reasonably necessary because of local climatic, geological, or topographical conditions." Section 17958.7, subdivision (a) mandates that the governing body of a city or county "shall make an express finding that such modifications or changes are reasonably necessary because of local climatic, geological, or topographical conditions." In other words, municipalities can modify the uniform codes only if "local climatic, geological, or topographical conditions" exist, and only if the municipality makes an express finding that such conditions exist.

If the Legislature had not intended for the Uniform Housing Code to generally preempt local regulations, sections 17958.5 and 17958.7 would have little meaning. Stated differently, it makes little sense to prescribe a narrow set of circumstances in which local entities can override state law if those entities are already free to override state law with impunity. This conclusion is in accord with *Danville Fire Protection Dist.* v. *Duffel Financial & Constr. Co.*, *supra*, 58 Cal.App.3d 241, where the court observed that "the limited grant of reserved power to local entities is by implication a denial of the grant of any greater jurisdiction." (*Id.* at p. 247.)

It is undisputed the City made no findings that local climatic, geological, or topographical conditions necessitated a departure from the occupancy standards set forth in the Uniform Housing Code.[3] The City thus failed to comply with the procedures set forth in sections 17958.5 and 17958.7. Unless the Uniform Housing Code is invalid on some other ground, the City's ordinance must be stricken.

## II

The City asserts that section 503 of the Uniform Housing Code is unconstitutional, and thus it is free to adopt any occupancy standard it sees fit. Its chain of constitutional logic goes something like this: (1) The Uniform Housing Code adopted the Uniform Building Code's definition of "family"; (2) "family" is defined under the Uniform Building Code as "an individual or two or more persons related by blood or marriage or a group of not more

---

[3]We think it highly unlikely, if not impossible, that the City could make such findings. There is nothing remarkable about the topography of Santa Ana; it is built on a plain. Similarly, the climate is as mild as most of the rest of Southern California. Finally, we are unaware of any relevant geological eccentricities in Santa Ana.

than five persons (excluding servants) who need not be related by blood or marriage living together in a dwelling unit"; (3) section 503 sets occupancy standards for "dwelling units"; (4) in *City of Santa Barbara v. Adamson, supra*, 27 Cal.3d 123, 134 (*Adamson*), our Supreme Court held that a definition of "family" identical in all material respects to that adopted by the Uniform Housing Code was unconstitutional; (5) section 503 is therefore unconstitutional.

Unlike the beleaguered trial judge, we have the advantage of reviewing this play in slow motion, somewhat like the instant replay booth of professional sports. On further review, the City's conclusion of unconstitutionality cannot stand for two reasons. First, we point out the rather obvious fact that the word "family" does not even appear in section 503; its presence can only be implied through the statute's use of the term "dwelling unit," which is defined as space limited to one "family." The term "family" is not important to section 503; it is an occupancy standard which speaks merely of how many people can live within the confines of a certain area.

█ Even if we assume that an invalid definition of "family" has crept into section 503 of the Uniform Housing Code, however, the City's claim of unconstitutionality ignores a fundamental precept: Invalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute. (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 355-356 [276 Cal.Rptr. 326, 801 P.2d 1077]; *In re Kapperman* (1974) 11 Cal.3d 542, 550 [114 Cal.Rptr. 97, 522 P.2d 657].) " 'The test of severability is whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the statutory scheme, or the utility of the remaining provisions. . . .' " (*People v. Barksdale* (1972) 8 Cal.3d 320, 333, [105 Cal.Rptr. 1, 503 P.2d 257] citations omitted.) We believe any overtones of "family" can be easily severed from section 503. The relationship of individuals living in a dwelling unit has no relevance to the health and safety of those in a dwelling, certainly insofar as an "occupancy standard" is concerned. An occupancy standard is merely a "numbers" game; a dwelling unit is overcrowded because there are too many people living in it, regardless of whether they are related. We believe that severing the "relationship" test (i.e., family) from section 503 does not affect the overall statutory scheme.

Another relevant consideration in severability analysis is whether the statute would have been adopted had the legislative body foreseen the invalidity of one provision. (*Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605].) The Supreme Court's decision in *Adamson* existed for many years prior to 1988, when both the Uniform Housing Code and the Uniform Building Code were readopted by state housing and building authorities. We must assume that

these entities were aware of *Adamson* (see *McLarand, Vasquez & Partners, Inc.* v. *Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1455 [282 Cal.Rptr. 828]), and did not intend their adoption of the uniform codes to be a useless and unconstitutional act. Therefore, to the extent the term "family" is part of section 503 of the Uniform Housing Code, it can be severed so as to render the remainder of the section valid. There is thus no "void" for the City's ordinance to fill.[4]

The City's reliance on *City of Chula Vista* v. *Pagard* (1981) 115 Cal.App.3d 785 [171 Cal.Rptr. 738] is misplaced. In *Pagard*, just as in *Adamson*, the court struck down a municipal occupancy ordinance because it unconstitutionally discriminated against cohabitants who were not related by blood or marriage. In dictum, the *Pagard* court suggested that municipalities could draw appropriate ordinances tied to objective standards such as minimum floor space. (*Id.* at p. 797.) The parties did not raise the issues of state preemption or the Uniform Housing Code, however, and *Pagard* therefore cannot be considered as authority on those points.

CONCLUSION

The City may be disheartened that we have invalidated its ordinance, but doing so saves us from having a curbside seat at the parade of horrors which would otherwise ensue. Had the ordinance survived our scrutiny, it would criminalize a level of occupant density which the state has determined is safe. This would force larger families out of their dwellings and into communities which do follow the Uniform Housing Code. This could only result in increased homelessness and exacerbate housing shortages statewide.

Overcrowding is a serious problem. But a piecemeal solution like that proposed by Santa Ana is not the answer. We are not unmindful of the demand high urban densities place on community services. Nevertheless, we

---

[4]In light of our disposition of this matter, we need not decide two issues; nonetheless, they deserve at least passing mention. First, Briseno contended below that the City's ordinance was invalid because its decision to submit a "negative declaration" on possible environmental effects of its ordinance was not supported by substantial evidence. This point would appear to have merit, since the city attorney conceded at oral argument that the ordinance would potentially affect "thousands" of Santa Ana residents. (See Cal. Code Regs., tit. 14, Appen. G ["a project will normally have a significant effect on the environment if it will . . . (m) Displace a large number of people . . . ."].) Amici curiae also raise the troubling issue of whether the City's ordinance violates state and federal fair housing laws. (See Gov. Code, § 65008; 42 U.S.C. § 3604(a).) While the ordinance appears to be facially neutral, amici curiae contend that its effect is to discriminate against large Hispanic families. If the City attempts to pass another ordinance under the guise of "local climatic, geological, or topographical conditions," these issues are almost certain to be raised again.

must presume the Legislature balanced the benefits of the statewide standard it adopted against the burdens it might impose on cities such as Santa Ana. Here, state law clearly preempts local regulation. The judgment is reversed.

Moore J., and Wallin, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 27, 1992.