[No. B074636. Second Dist., Div. One. Mar. 30, 1994.]

ABS INSTITUTE et al., Plaintiffs and Appellants, v.
CITY OF LANCASTER, Defendant and Respondent.

**COUNSEL**

Sanford I. Millar and Joel P. Schiff for Plaintiffs and Appellants.

Stradling, Yocca, Carlson & Rauth, Donald J. Hamman and David H. Mann for Defendant and Respondent.

## OPINION

**VOGEL (Miriam A.), J**—ABS Institute, Colby Plastics, and Polaris Pipe Company, Inc., filed a complaint for declaratory and injunctive relief challenging a City of Lancaster ordinance adopted to prohibit the use of ABS cellular pipe.[1] Judgment was entered in favor of the City and the Institute appeals. We affirm.

## BACKGROUND

### A.

Until the 1970's, every city and county in California adopted its own building code, unfettered by mandated state standards or state control. (*City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 97 [48 Cal.Rptr. 889, 410 P.2d 393].) In 1970, the Legislature put an end to all that by declaring a statewide interest in uniform building codes (Stats. 1970, ch. 1436, § 7, p. 2785) and otherwise expressing an intent to generally preempt the field. (*Baum Electric Co.* v. *City of Huntington Beach* (1973) 33 Cal.App.3d 573, 577 [109 Cal.Rptr. 260]; see also *Danville Fire Protection Dist.* v. *Duffel Financial & Constr. Co.* (1976) 58 Cal.App.3d 241, 248 [129 Cal.Rptr. 882].) But that is not to say that local authorities may never adopt ordinances which vary from the uniform codes. They may do so if they come within the exception of section 17958.5 of the Health and Safety Code,[2] which provides that ". . . a city or county may make such changes or modifications in the requirements contained in the provisions published in the California Building Standards Code and the other regulations adopted pursuant to Section 17922 [the Uniform Housing Code] as it determines, pursuant to the provisions of Section 17958.7, are *reasonably necessary because of local climatic, geological, or topographical conditions.*" (Italics added.) To qualify for this preemption exception, the local entity must (as provided in subdivision (a) of section 17958.7) "make *an express finding* that such modifications or changes are

---

[1]ABS is an acronym for acrylonitrile-butadiene-styrene, a plastic pipe manufactured in both solid wall and cellular core forms. The ABS Institute is a trade association of ABS resin suppliers and ABS plastic and pipe manufacturers; the other appellants are manufacturers. For convenience, we refer to the appellants collectively as "the Institute."

[2]Unless otherwise stated, all section references are to the Health and Safety Code.

reasonably necessary because of local climatic, geological or topographical conditions." (Italics added.)[3]

### B.

The state, through the Department of Housing and Community Development (HCD), reviews national model uniform codes and promulgates modifications which, in turn, are reviewed and approved by the California Building Standards Commission (and are then referred to as the California Building Standards Code). (§§ 17922, 18930, 18935.) Uniformity is achieved by requiring all cities and counties to adopt the uniform building codes, as modified by the HCD, as their local building codes. (§§ 17958, 18941.5.) Local modifications are permitted only as allowed by sections 17958.5 and 17958.7.

### C.

Before 1982, the Uniform Plumbing Code (and, therefore, the California Building Standards Code) restricted the use of ABS pipe to "drain, waste and vent" pipe in residential structures of "two stories or less." In 1982, the Uniform Plumbing Code deleted the "two stories or less" limit and permitted the use of ABS pipe in any structure built with other "combustible" construction materials. But California did not go along with this amendment. Instead, it continued (and still continues) the two-story residential restriction on ABS pipe. (Cal. Code Regs., tit. 24, §§ 401, subd. (a)(2), 503, subd. (a)(2), & 1004, subd. (a).)[4]

### FACTS

In 1989, the Lancaster City Council first considered Ordinance No. 541 which would have adopted HCD's modified Uniform Plumbing Code (with the two-story residential restriction on the use of ABS pipe). In reaction to citizen concerns about public safety, however, the City Council had its staff study the issue and prepare a report. Among other things, the report explained that some California cities (including Beverly Hills and San Leandro) had always banned the use of ABS drain, waste and vent piping and

---

[3]Not surprisingly, the Institute and the City read these statutes from different perspectives. The Institute sees an almost total preemption, with an extremely narrow exception. The City sees an "unmistakable" declaration of "shared authority." As will appear, we agree with the Institute that the field has been preempted but we conclude the City has followed the appropriate procedure and made the findings necessary to bring its ordinance within the statutory exception of section 17958.7.

[4]Meanwhile, in 1991 the Uniform Plumbing Code backed off its 1982 amendment and now permits the use of ABS pipe only in "structures not exceeding three floors above grade." California retained the two-story restriction for the same reason the model code went back to a three-story restriction—fire. ABS pipe melts in fires and, when it melts, it emits highly toxic gasses.

that there had been some "failures" of ABS systems in those parts of the state where its use was permitted, as a result of which the International Association of Plumbing and Mechanical Officials (which publishes the Uniform Plumbing Code) had tightened its quality control program. The report recommended retention of the existing two-story residential restriction "unless testimony at the hearing [on the proposed ordinance] demonstrates to the Council further restriction is necessary."

At the scheduled hearing on the ordinance (Mar. 19, 1990), it became apparent that the ABS pipe issue needed further study and the hearing was therefore continued to April 2, 1990. On April 2, the plumbing code was segregated from the other codes covered by Ordinance No. 541 and introduced separately as Ordinance No. 545. After a request from an ABS pipe proponent for "a future public forum for addressing the pros and cons of the matter," the issue was continued to a special meeting set for May 9. Although ABS proponents as well as its opponents attended the meeting, only one expert testified. Tom Reed, a chemist with 17 years' experience who had been studying plastic pipe, including ABS, for 10 years, asked the City of Lancaster to "consider the inherent unsuitability of ABS for use in drain, waste and vent and [to] consider the City's geography, climate and the environment as a basis for excluding the pipe from the City Code."

Reed's testimony is quoted at length below. For the moment, it suffices to note that Reed stressed the flammability of ABS cellular pipe and the proximity of Lancaster to the San Andreas Fault, and then summed it up this way: "In your community here, because of your concern for seismic safety, fire safety, because of the intense sunlight and temperature changes of your desert environment, because of your problems with air quality, and your concern over water quality and solid waste, it may be appropriate for you to exclude this from the Code. The City is growing very rapidly and it seems that in the light of the City's special conditions and the questions over the mechanical suitability of the pipe, that excluding the material from the Code today, may ensure that these buildings which are being built and which will become an enduring part of your City, will be quality environments and be safe and will comply with the goals . . . set forth in your own General Plan."

In addition to Reed, there was testimony by other, nonexpert witnesses opposed to the use of ABS pipe. David Birka-White, an attorney specializing in ABS pipe lawsuits (he represents plaintiffs), testified about his experience in 40 to 50 lawsuits since 1986. He commented upon statewide incidents of pipe failures, with sewage dumped directly into the walls of houses, and similar problems. In his view, the ABS pipe industry has been unable to

regulate itself sufficiently to ensure a quality product. A local plumber, Arnold A. Rodio, Jr., testified about several plumbing failures involving ABS pipe manufactured by several different companies.

No expert testimony was offered by the ABS proponents to controvert Reed's evidence about Lancaster's climatic, topographical and geological conditions. Instead, Sanford Millar, the Institute's attorney, testified about industry efforts to satisfy the HCD's concerns; Ted Grizzell, representing the Plastic Pipe and Fittings Association, testified in favor of expanded use of ABS pipe and pointed to a trade publication showing various devices available to inhibit the spread of smoke and fire through plastic pipe; and other plastic pipe manufacturers, wholesalers and plumbers testified in favor of ABS pipe.

On June 4, 1990, the City Council approved Ordinance No. 545, adopting by reference the Uniform Plumbing Code but prohibiting all use of cellular core ABS pipe in the City and limiting the use of solid core ABS pipe in residential construction to buildings not more than two stories in height.[5] Included in Ordinance No. 545 was a finding of necessity: "The provisions of this chapter are reasonably necessary because of local climatic, geographical, or topographical conditions. These findings are made pursuant to Sections 17958.5 and 17958.7 of the State Health and Safety Code and based upon evidence presented at the May 9, 1990 City Council meeting." As required by section 17958.7, subdivision (a), the City filed a copy of Ordinance No. 545 and a copy of the minutes of the May 9 meeting with HCD. After HCD notified the City that its "findings of need" were insufficient, the City Council adopted Resolution No. 90-277 to clarify its findings. Among other things, the City found that:

—"A significant portion of the residential area of the City lies in the vicinity near the San Andreas Fault. The location of the Fault increases the likelihood of seismic disturbances of substantial magnitude occurring which would cause consequent damage. Such damage is often accompanied by structural fire. Because cellular core ABS pipe is combustible, emits toxic gases and acids, and generates large amounts of smoke, its presence increases the threat to life and property in the event of a seismic disturbance. Additionally, seismic activity would cause cellular core ABS pipe to weaken over time, yielding sewage problems."

—"A large area under residential development in the northwestern portion of the City . . . is potentially subject to liquefaction which may cause a loss

[5]In 1991, the state adopted a revised model Plumbing Code and the City, in turn, readopted Ordinance No. 545 in 1992 (as Ordinance No. 604). The parties have stipulated that this litigation applies to the current version of the ordinance.

of lateral support for cellular core ABS pipe, resulting in its failure. Liquefaction often results in a greater degree and different form of differential movement which may cause excessive strain on cellular core ABS pipe."

—"A sizable portion of the City . . . is characterized by soils of high shrink-swell potential which will cause excessive strain on cellular core ABS pipe."

—"The City is subject to climatic extremes where temperatures rise over one hundred degrees during the summer months and drop well below freezing at night during the winter months. The dramatic fluctuation in temperatures from the winter to summer months may cause excessive thermo-expansion and rapid degradation of cellular core ABS pipe resulting in its failure."

—"High wind conditions normally exist in all areas of the City increasing the potential for fire spread. The presence of plastic pipe in combination with high winds increases the life hazard in the event of a fire."

—"The City is divided by a major railway line and the Antelope Valley Freeway where homes are currently under development on both sides of such barriers. All vehicular travel across the railroad tracks is accomplished only through at-grade crossings. In the event of a major earthquake, there is a risk of disrupted rail use and blockage of the grade crossing. The barrier created by the railway line presents a hazard because vehicles responding to emergencies face potential delays or total obstruction across the railroad tracks. Further, a major earthquake may result in the collapse of freeway over—crossings or undercrossings and a disruption of east-west access. In the event of a fire, toxic gases and acids emitted by cellular core ABS pipe and the smoke generated by the pipe create an increased hazard to life due to asphyxiation. Rapid response by emergency equipment becomes more critical as a result of the use of cellular core ABS pipe. . . ."

These findings and Ordinance No. 545 were submitted to HCD. Before they were accepted (which they ultimately were), the Institute filed its complaint for declaratory and injunctive relief, alleging the Ordinance was invalid. The matter proceeded to trial on stipulated facts, at the conclusion of which the trial court rejected the Institute's push for independent judgment review, concluding that under either a "substantial evidence" or "abuse of discretion" standard, the City's findings were sufficient. The Institute appeals from the judgment thereafter entered in favor of the City.

## DISCUSSION

### I.

■ Emphasizing preemption over local regulation, the Institute contends the uniform building codes expressly and impliedly preempt the field and local enactments are proper only when adopted in conformity with sections 17958.5 and 17958.7. Emphasizing the statutory exception, the City contends it is expressly authorized to modify a building code when local conditions made it necessary to do so. We choose not to play this game of semantics and simply state the rule as it has been declared by the Legislature:

■ There is a statewide interest in uniform building codes and the field has therefore been preempted by state law, subject to a statutory exception which permits a local entity to modify the provisions of the California Building Standards Code when it determines, and expressly finds, that such changes are reasonably necessary because of local climatic, geological or topographical conditions. (§§ 17922, 17958.5, 17958.7; *Baum Electric Co. v. City of Huntington Beach, supra,* 33 Cal.App.3d at p. 577; *Danville Fire Protection Dist.* v. *Duffel Financial & Constr. Co., supra,* 58 Cal.App.3d at pp. 245-246; *Briseno* v. *City of Santa Ana* (1992) 6 Cal.App.4th 1378, 1381-1383 [8 Cal.Rptr.2d 486].)

### II.

■ We summarily reject the Institute's suggestion that there "is a serious issue in this case whether the authority of the City to adopt the ordinance ended because the findings were not adopted with the 180 day period" specified in section 17958 but rather were retroactively adopted thereafter. The Institute is reading into the statute a timing limitation which does not exist.

Section 17958 recites the right of cities and counties to make changes in the manner provided in sections 17958.5 and 17958.7 and provides that "[a]mendments, additions, and deletions to the State Building Standards Code adopted by a city or county pursuant to Section 17958.7, together with all applicable portions of the State Building Standards Code, *shall become effective 180 days after publication of the State Building Standards Code* by the State Building Standards Commission." (Italics added.) Nothing in this statute suggests that a delay in the effective date occasioned by the state's request for additional information somehow affects an otherwise timely modification. Accordingly, there is no issue, "serious" or otherwise, about the timing.

## III.

■ The Institute contends section 17958.5 "requires findings that local conditions (climatic, geological or topographical) deviate from prevailing statewide conditions, and that the deviation affects directly the element of the statewide code which is being modified." We disagree.

The statute, which is clear on its face, does not require a showing that the local conditions "deviate from prevailing statewide conditions," only that the changes are "reasonably necessary because of local climatic, geological, or topographical conditions." (§ 17958.5.) Where, as here, a statute is written in clear and unambiguous language, we need not search for some hidden meaning; to the contrary, we simply give the Legislature credit for saying what it meant. (*Planned Parenthood Affiliates* v. *Swoap* (1985) 173 Cal.App.3d 1187, 1193 [219 Cal.Rptr. 664].) In this instance, the statute does not tell us that a city has to establish that it has a peculiar, unusual or other deviant condition in order to justify a modification of a uniform code. To the contrary, it tells us that a city must show that its local climatic, geological or topographical conditions make it reasonably necessary to do something different than is required or permitted for the rest of the state.

Lancaster's proximity to a major earthquake fault illustrates the point. The Legislature has not said that the City of Lancaster must show that its proximity to the San Andreas Fault deviates from statewide conditions which, of course, it does not. Under the statute, all the City has to show is that its proximity to the San Andreas Fault makes it reasonably necessary to prohibit the use of cellular ABS pipe in residential construction, no more and no less.

We reject the Institute's suggestion that its reading of the statute is the only way to give effect to the Legislature's intent to preempt the field. The same Legislature that found the need for preemption also created the exception in section 17958.5, thereby demonstrating its understanding that the preemption of the field is not absolute. (See § 18941.5, subd. (b) ["Neither the State Building Standards Law . . . nor the application of building standards . . . shall limit the authority of a city, county, or city and county to establish more restrictive building standards reasonably necessary because of local climatic, geological, or topographical conditions"].)

Accordingly, it was not necessary for the City to demonstrate that its conditions deviated from statewide conditions.

## IV.

■ The Institute contends the City's adoption of findings is an adjudicatory (not a legislative) process which, in turn, means the trial court should

have exercised its independent judgment in reviewing the evidence, conducted a de novo review and, if it decided to do so, substituted its decision for that of the City Council. We disagree.

## A.

The fact that findings are required does not transform a legislative act into an adjudicatory process. ■ As the court explained in *Joint Council of Interns & Residents* v. *Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1209 [258 Cal.Rptr. 762], "a legislative act generally predetermines what the rules shall be for the regulation of future cases falling under its provisions, while an adjudicatory act applies law to determine specific rights based upon specific facts ascertained from evidence adduced at a hearing." The adoption of an ordinance is a legislative act. (See *Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 327-329 [4 Cal.Rptr.2d 897] [a decision to impose school fees supported by statutorily mandated findings is nonetheless a legislative act].)

## B.

■ But even assuming for the sake of discussion that there is an adjudicatory element present when findings are made, that fact alone does not obligate or even permit a trial court to exercise its independent judgment, substituting its conclusions for those of a legislative body. No fundamental vested rights are affected by the City's adoption of Ordinance No. 545 (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872] [". . . there is no vested right to conduct a business free of reasonable governmental rules and regulations"]; *Champion Motorcycles, Inc.* v. *New Motor Vehicle Bd.* (1988) 200 Cal.App.3d 819, 824 [246 Cal.Rptr. 325] [the preservation of purely economic interests does not affect fundamental vested rights]), and the cases cited by the Institute for a contrary result are all inapposite.

## C.

The Institute contends that, if it was not entitled to independent judgment review, it at least had a right (in the trial court) to substantial evidence review. (See *Nishkian* v. *City of Long Beach* (1951) 103 Cal.App.2d 749, 751 [230 P.2d 156]; *Gubser* v. *Department of Employment* (1969) 271 Cal.App.2d 240, 245 [76 Cal.Rptr. 577] [substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support [the city's] conclusion"].) The City, in turn, claims the question was whether it abused its discretion. (*Fullerton Joint Union High School Dist.* v. *State Bd. of*

*Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168] [the inquiry is not whether, if it had power to act in the first instance, the trial court would have taken the same action; "[t]he authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair"].)

For at least two reasons, we need not decide whether the trial court should have used the substantial evidence or abuse of discretion standard. First, the trial court wisely made a complete record by applying both tests and concluded that, under either standard, the findings are not subject to attack. Second, as the court explained in *Balch Enterprises, Inc.* v. *New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 792 [268 Cal.Rptr. 543], the question under both standards is the same—whether there was a reasonable basis for the decision. In this case, the answer under both standards is a resounding "yes."

Reed testified that ABS drain, waste and vent pipe is unsuitable as a plumbing material because it can absorb household chemicals which, in turn, can contribute to its mechanical failure. It degrades "very rapidly" when exposed to intense sunlight or to ozone and, "of course, if it burns, and it burns readily, it releases toxic smoke. . . . ABS is basically a highly flammable material and the ABS which is being used for drain, waste [and] vent pipe is a very highly flammable material." Reed then explained that "some of the most important [local factors] are identified in the City's own General Plan."

According to Reed, the most significant local issue in Lancaster is earthquakes. "The whole Antelope Valley is bounded by the San Andreas Fault . . . and you have a high potential for seismic damage, not only ground shaking but ground liquefaction. Your City General Plan identifies this as being a very significant constraint both to the City that exists today and the City that you are building for the future—and you're building very rapidly. Most of the City and its Sphere of Influence is in Seismic Class I which is subject to severe shaking, and in fact, much of it is an area subject to liquefaction."

Reed continued: "[T]he pipe is rigid . . . and it doesn't have as much flexibility as the alternative, which is cast iron with a stainless steel and neoprene connector. So, in the event of seismic shaking, . . . there is a greater likelihood that pipe which is weakened through environmental attack or chemical attack . . . , pipe that is weakened this way can fail. And I can tell you from having been in the Bay area during our October quake, people

were shocked at how little damage it took to make a structure uninhabitable. And, in the panic of a quake and the damage that you have, the last thing you need is sewage all over the place. The last thing you need is having . . . part of your housing stock, put out of action simply because there is . . . damage to the drain, waste [and] vent system. It is an important thing to consider in an area of high seismic risk."

Flammability, he explained, is an issue by itself and as it relates to earthquakes: "The fire hazard aspect of ABS is also significant . . . in the context of a seismically active area. ABS burns well. . . . ABS is in important places in a house. It's underneath. It's behind the walls. It's out of sight. A lot of fires start in basements from . . . heating systems or defective wiring or things like that and the ABS is able to propagate fire and toxic smoke out of sight and out of the reach of smoke detectors. . . . Now, when you combine an earthquake and fire potential, you get the standard disaster scenario that a City must face. In the 1906 quake in San Francisco, . . . it was the fires that destroyed the City. Again, in 1989, it was the fires and the difficulty of controlling the fires. And so, in a seismically active area, it seems that the last thing you'd want is more flammable material . . . . So, I think in terms of . . . the location close to the San Andreas Fault, . . . ABS deserves serious consideration in exclusion."

And Reed described other important local factors, including intense sunlight, ozone and a high degree of temperature variations. The change from an intensely cold night to rapid warming during the day "puts a lot of mechanical stress on the system." ABS installation requires glue, which contains solvent, which contributes to air quality problems. Waste disposal is another problem. "The mere presence of the flammable ABS makes demolition debris non-inert [which] can cause a problem for an area that is concerned with landfill capacity. And plus, it's a hard product to recycle correctly."

The City's findings, based primarily on Reed's uncontroverted testimony, are clearly based on substantial evidence (*Kearl* v. *Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1052 [236 Cal. Rptr 526] [the testimony of one credible witness is sufficient to constitute substantial evidence]; *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 803-804 [161 Cal.Rptr. 260] [a difference of opinion, no matter how strongly presented, does not warrant rejection of a city's action where the city was presented with opposing viewpoints, which it considered extensively, and on the basis of evidence selected one alternative rather than the other]) and, for the same reason, the City did not abuse its discretion.

### D.

As should be apparent by this point, the Institute's related contention that we are entitled to reach a different result based on our review of the record

is technically correct but irrelevant. We have read Reed's testimony, reviewed the other evidence and considered the findings made by the City Council. We are satisfied, as was the trial court, that the evidence amply supports the findings, that there was no abuse of discretion, and that there is a reasonable basis for the City's findings and its adoption of Ordinance No. 545. Lancaster's proximity to a major earthquake fault and its climatic extremes, when combined with the flammable nature of ABS cellular pipe, together constitute a reasonably necessary basis for an amendment to the Uniform Plumbing Code.

## V.

Finally, we summarily reject the Institute's argument that it has been denied the equal protection of the laws because not all plastic pipe was banned by Ordinance No. 545. Where, as here, there is no evidence in the record to show whether other plastic pipe is as flammable or otherwise subject to the same criticisms as ABS cellular pipe, a local economic regulation is not subject to attack on equal protection grounds. (*New Orleans* v. *Dukes* (1976) 427 U.S. 297, 303 [49 L.Ed.2d 511, 516-517, 96 S.Ct. 2513] [unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions, the constitutionality of a local economic regulation will be presumed].)

### DISPOSITION

The judgment is affirmed. The City of Lancaster is awarded its costs of appeal.

Spencer, P. J., and Ortega, J., concurred.