[No. H037088. Sixth Dist. July 16, 2012.]

HAROLD GRIFFITH, Plaintiff and Appellant, v.
CITY OF SANTA CRUZ, Defendant and Respondent.

## Counsel

Harold Griffith, in pro. per., for Plaintiff and Appellant.

Atchison, Barisone, Condotti & Kovacevich, George J. Kovacevich and S. Adair Paterno for Defendant and Respondent.

## Opinion

**PREMO, J.**—Petitioner Harold Griffith filed a petition for writ of mandate seeking to invalidate an ordinance enacted by respondent City of Santa Cruz (City). The ordinance calls for annual inspections of all residential rental properties within City limits. Petitioner argued, among other things, that the ordinance is preempted by the State Housing Law (Health & Saf. Code, § 17910 et seq.),[1] violates constitutional principles of privacy and equal protection, and imposes a tax in violation of Proposition 218 (Cal. Const., art. XIII D) and Proposition 26 (Cal. Const., art. XIII C, § 1, subd. (e)). The superior court denied the petition. Finding no error, we shall affirm.

### I. The Ordinance

City passed ordinance No. 2010-17, the Residential Rental Dwelling Unit Inspection and Maintenance Program (the Ordinance), on September 7, 2010, and codified it as section 21.06.010 et seq. of the City of Santa Cruz Municipal Code (SCMC). The purpose of the Ordinance is to identify "substandard and unsafe residential buildings and dwelling units and to ensure the rehabilitation or elimination of those buildings and dwelling units that do not meet minimum building code and housing code standards, or are not safe to occupy or do not comply with zoning codes." (SCMC, § 21.06.010.) The Ordinance was prompted by City's finding "substandard, overcrowded and/or unsanitary residential rental buildings and dwelling units,

---

[1] Further unspecified section references are to the Health and Safety Code.

the physical conditions and characteristics of which violate state and local building, housing and sanitation codes and ordinances and render them unfit or unsafe for human occupancy and habitation." (*Ibid.*) City found these conditions to "jeopardize the health, safety, and welfare of their occupants and of the public" and "seriously compromise the integrity and residential quality of city neighborhoods . . . ." (*Ibid.*) City's findings further explain: "It has been observed by city staff performing code enforcement functions that in general the most egregious violations of health and safety codes and negative impacts as a result of overcrowding are experienced in rental housing." (*Ibid.*)

Under the Ordinance, residential rental dwelling units that are not occupied by the owner of the property are subject to an annual inspection by City staff. (SCMC, § 21.06.020E.) Owners must provide access within 21 days of a request for an inspection; when there is a tenant living on the premises the owner must ask the tenant to allow the inspection. The owner will not be in violation if the tenant refuses. (*Id.*, § 21.06.070A.) Where a tenant or landlord has refused to consent to an inspection, "the inspector shall have recourse to every remedy provided by law to secure lawful entry . . . ." (*Id.*, § 21.06.090A.) And if the inspector has "reasonable cause to believe" that the unit is "so hazardous, unsafe or dangerous as to require immediate inspection to safeguard the public health or safety," the inspector "may use any reasonable means required to effect the entry and make an inspection." (*Id.*, § 21.06.090B.) Well-maintained properties may avoid inspection by qualifying for self-certification. (*Id.*, § 21.06.080.)

When an inspector observes a building, housing or sanitation violation the inspector "shall document the violation, advise the owner or operator of the violation and of the action which must be undertaken and completed in order to remedy the violation and schedule a reinspection to verify correction of the violation." (SCMC, § 21.06.070C.) Owners who fail to correct a violation are subject to City's previously enacted code enforcement provisions. (*Id.*, § 4.01 et seq.)

The Ordinance provides for the establishment of fees for annual registration, self-certification, inspection, and reinspection in amounts "established by resolution of the city council." (SCMC, § 21.06.060.) The city council, by resolution, set the annual registration fee at $45 per unit. The inspection fee is $20 per unit; the self-certification fee is $20 per unit up to 20 percent of the units; and the reinspection fee is $107 per hour.

## II. PROCEDURAL BACKGROUND

Petitioner is the owner of residential rental properties within City limits. He filed a first amended petition for writ of mandate and complaint for

declaratory relief alleging that the Ordinance is preempted by the State Housing Law and duplicates or conflicts with the 1997 Uniform Housing Code of the International Conference of Building Officials (UHC) incorporated within it. Petitioner also alleged that the Ordinance violates the equal protection clauses of the state and federal Constitutions (Cal. Const., art. I, § 7; U.S. Const., 14th Amend.) and the owner or occupant's state constitutional right to privacy (Cal. Const., art. I, § 1). As to the fees, petitioner maintained that they are illegal taxes, enacted in violation of the requirements of Proposition 218. After the November 2010 passage of Proposition 26, which expanded the definition of "taxes," petitioner added it as another basis for his challenge.[2] In response, City introduced evidence to show that revenue from the fees was expected to be around $327,000 per year. In a declaration, City planning director, Alex Khoury, stated that the cost of implementing the Ordinance would be about $321,000 per year, which includes salaries for two inspectors, one administrative assistant, and administrative expenses. In addition, implementation would require "supervisory support and support from staff of other departments [such as Finance and Fire]." It was Khoury's opinion that the total costs City would incur in implementing the Ordinance would be "equal to or greater than the fee(s) levied on rental property owners pursuant to the [Ordinance]."

The superior court denied the petition. The court concluded that the Ordinance was rationally related to City's legitimate purpose of ensuring a stock of "safe, decent and sanitary rental housing" so that there was no equal protection violation. The Ordinance was not preempted by state law because it did not set up any new or different standards and did not duplicate procedures. The fee provisions did not violate Proposition 218 and were expressly exempt from the broadened definition of "tax" provided by Proposition 26. The only evidence submitted showed that the cost of the inspection program would be about $321,000 per year while annual revenue would be around $327,000. The superior court found "there is a reasonable relationship between the fees and costs." Because the court's conclusions disposed of the declaratory relief causes of action, the court dismissed those as well.

### III. Issues and Standard of Review

Petitioner appeals from the superior court's order denying his petition for writ of mandate. He raises the same arguments he raised below: (1) preemption, (2) invasion of privacy, (3) equal protection, and (4) violation of

---

[2] Petitioner did not further amend his first amended petition but simply raised the Proposition 26 issue in his argument before the superior court.

Propositions 218 and 26. As we read them, all these arguments are subject to a de novo or independent standard of review. Any facts needed to resolve the issues are undisputed. The constitutional challenges are facial challenges to the Ordinance as it is written. In such a case we do not defer to the superior court's ruling; we independently interpret the law to determine whether or not it is constitutional. (*Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 89–90 [133 Cal.Rptr.3d 155] (*Rental Housing*).) The question of preemption is also subject to our independent review. (*City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 882 [35 Cal.Rptr.3d 216].)

## IV. DISCUSSION

### A. Preemption

■ Petitioner argues that the Ordinance is preempted by the State Housing Law. In particular, petitioner contends that the Ordinance conflicts with or enters into an area fully occupied by the UHC, which is incorporated into the State Housing Law by way of section 17922. City maintains that there is no actual conflict between the State Housing Law and the Ordinance. City is correct.

■ City is a charter city. As such, City "enjoys autonomous rule over municipal affairs pursuant to article XI, section 5 of the California Constitution, 'subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law.' " (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 363 [87 Cal.Rptr.2d 654, 981 P.2d 499].) When a court is asked to resolve an alleged conflict between a state statute and the law of a charter city, it must first satisfy itself that an actual conflict exists. If no conflict exists, no determination of legal superiority is required. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16 [283 Cal.Rptr. 569, 812 P.2d 916].)

■ The State Housing Law provides that statewide building and housing standards must impose "substantially the same requirements" as those contained in the uniform codes, including the UHC. (§ 17922, subd. (a).) Under the state law, "a local government is precluded from enacting building standards that differ from state standards unless a state statute specifically authorizes the local government to do so." (*Building Industry Assn. v. City of Livermore* (1996) 45 Cal.App.4th 719, 724 [52 Cal.Rptr.2d 902].) Local jurisdictions may enact standards which differ from those set forth in the

UHC only if " 'local climatic, geological, or topographical conditions' " exist, and only if the municipality makes an express finding that such conditions exist. (*Briseno v. City of Santa Ana* (1992) 6 Cal.App.4th 1378, 1383 [8 Cal.Rptr.2d 486] (*Briseno*); § 17958.7, subd. (a).)

█ Petitioner relies upon *Briseno, supra*, 6 Cal.App.4th at page 1379, which concerned an ordinance that increased the minimum room size set by the UHC. The appellate court struck down the ordinance because the city had not made the findings required by the State Housing Law to enact a differing standard. The Ordinance in this case does not alter or modify the standards set by the general law. The Ordinance merely provides a method of enforcement of the statewide standards by providing for periodic inspections of rental dwellings. Indeed, the State Housing Law contemplates that the local jurisdictions will enforce its standards (see §§ 17961, subd. (a), 17970, 17980, subd. (a)) and even specifies that " 'enforcement' may, but need not, include inspections of existing buildings on which no complaint or permit application has been filed, and effort to secure compliance as to these existing buildings." (§ 17920, subd. (e).)

Petitioner implicitly concedes that the Ordinance does not establish standards. Petitioner argues, however, that City's inspection checklists modify the conditions listed in section 17920.3, which are the conditions the Legislature has determined qualify as substandard.[3] But as City correctly points out, the checklists are not ordinances; they are data collection tools designed for use

---

[3] Section 17920.3 provides, in pertinent part, that a dwelling "in which there exists any of the following listed conditions to an extent that endangers the life, limb, health, property, safety, or welfare of the public or the occupants thereof shall be deemed and hereby is declared to be a substandard building:

"(a) Inadequate sanitation . . . : [¶] . . . [¶]

"(b) Structural hazards . . . : [¶] . . . [¶]

"(c) Any nuisance.

"(d) All wiring, except that which conformed with all applicable laws in effect at the time of installation if it is currently in good and safe condition and working properly.

"(e) All plumbing, except plumbing that conformed with all applicable laws in effect at the time of installation and has been maintained in good condition, or that may not have conformed with all applicable laws in effect at the time of installation but is currently in good and safe condition and working properly, and that is free of cross connections and siphonage between fixtures.

"(f) All mechanical equipment, including vents, except equipment that conformed with all applicable laws in effect at the time of installation and that has been maintained in good and safe condition, or that may not have conformed with all applicable laws in effect at the time of installation but is currently in good and safe condition and working properly.

"(g) Faulty weather protection . . . : [¶] . . . [¶]

"(h) Any building or portion thereof, device, apparatus, equipment, combustible waste, or vegetation that, in the opinion of the chief of the fire department or his deputy, is in such a condition as to cause a fire or explosion or provide a ready fuel to augment the spread and intensity of fire or explosion arising from any cause.

"(i) All materials of construction, except those which are specifically allowed or approved by this code, and which have been adequately maintained in good and safe condition.

by inspectors and self-certifying landlords. If, for example, the inspector finds that the property is infested with vermin, the inspector must notify the owner and give the owner a chance to correct the problem. By checking the box next to "infestation," on the checklist, the inspector merely documents the observation. More importantly, even if the checklists had the force of law, there is no preemption problem because the checklists do not conflict with the general law. Petitioner does not explain in what particular he believes the checklists modify statewide standards. Our review shows that the items contained on the checklists are substantially the same as the items listed in section 17920.3.

■ Petitioner mentions section 17922, subdivision (g), which prohibits a local agency from permitting "any action or proceeding to abate violations of regulations governing maintenance of existing buildings, unless the building is a substandard building or the violation is a misdemeanor." This subdivision does not preempt the Ordinance because the Ordinance does not provide for an abatement proceeding. Although the Ordinance contemplates that a landlord, when alerted to a violation, will correct it, that is not an abatement *action or proceeding*. To the extent an inspection triggers other provisions of City's municipal code that do provide for abatement proceedings, those provisions are not before us.

■ Petitioner argues that the Ordinance conflicts with Civil Code section 1954, which restricts a landlord's right to enter rented premises only upon consent of the tenant. The Ordinance does not require a landlord to enter rented premises absent the tenant's consent and, therefore, does not alter or conflict with Civil Code section 1954. (See *Rental Housing, supra,* 200 Cal.App.4th at pp. 92–93.)　■　Nor does the Ordinance conflict with Code of Civil Procedure section 1822.50 et seq. as petitioner maintains. That section allows a court to issue a warrant to inspect a building. Absent consent of both the tenant and the landlord, a City inspector has recourse to any "remedy provided by law to secure lawful entry." (SCMC, § 21.06.090A.) An

---

"(j) Those premises on which an accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rodent harborages, stagnant water, combustible materials, and similar materials or conditions constitute fire, health, or safety hazards.

"(k) Any building or portion thereof that is determined to be an unsafe building due to inadequate maintenance . . . .

"(l) All buildings or portions thereof not provided with adequate exit facilities . . . . [¶] . . . [¶]

"(m) All buildings or portions thereof that are not provided with the fire-resistive construction or fire-extinguishing systems or equipment required by this code . . . .

"(n) All buildings or portions thereof occupied for living, sleeping, cooking, or dining purposes that were not designed or intended to be used for those occupancies.

"(o) Inadequate structural resistance to horizontal forces.

" 'Substandard building' includes a building not in compliance with Section 13143.2."

inspection warrant issued pursuant to Code of Civil Procedure section 1822.50 et seq. would be one such remedy.

### B. Right to Privacy

Citing *Camara v. Municipal Court* (1967) 387 U.S. 523, 538 [18 L.Ed.2d 930, 87 S.Ct. 1727], petitioner argues that the Ordinance violates the Fourth Amendment to the United States Constitution because it allows warrantless administrative searches. Petitioner has no standing to assert the claim on behalf of tenants because he has no privacy interest in units occupied by tenants. (*Rental Housing, supra*, 200 Cal.App.4th at pp. 91–92.) Furthermore, petitioner misconstrues the Ordinance.

■ The Ordinance requires inspectors to obtain the consent of the landlord and the tenant before an inspection may take place. In the absence of consent, the inspector may enter only as allowed by law, as by obtaining an inspection warrant. Inspection without consent and without other express legal authorization is permitted only if the inspector has reasonable cause to believe that the unit is so dangerous that immediate inspection is required "to safeguard the public health or safety." (SCMC, § 21.06.090B.) Warrantless inspections in exigent circumstances are acceptable under the Fourth Amendment. (Cf. *Camara v. Municipal Court, supra*, 387 U.S. at pp. 539–540.) Accordingly, even if petitioner had standing to raise the privacy issue, we would reject it. (See *Rental Housing, supra*, 200 Cal.App.4th at p. 92 [rejecting 4th Amend. challenge to ordinance allowing inspection absent consent only by way of an inspection warrant].)

### C. Equal Protection

Petitioner maintains that the Ordinance violates his right to equal protection because it applies a set of rules to owners of rental properties that are not applicable to other property owners. We reject the argument.

■ "Equal protection of the law means that persons who are similarly situated with respect to a law must be treated alike under the law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857 [99 Cal.Rptr.3d 503].) But depending upon the circumstances, differential treatment can be constitutionally valid. 'In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations.] Where there are "plausible reasons" for [the government] action, "our inquiry is at an end." [Citation.] This

standard of review is a paradigm of judicial restraint. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." ' (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313–314 [124 L.Ed.2d 211, 113 S.Ct. 2096]; see also *Warden v. State Bar* (1999) 21 Cal.4th 628, 645 [88 Cal.Rptr.2d 283, 982 P.2d 154].) 'In other words, the plaintiff must show that the difference in treatment was " 'so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.' " ' (*Las Lomas, supra,* at p. 859, quoting *Gregory v. Ashcroft* (1991) 501 U.S. 452, 471 [115 L.Ed.2d 410, 111 S.Ct. 2395].)" (*Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1534–1535 [129 Cal.Rptr.3d 369].)

There is no dispute that the rational basis test is applicable in this case. If we assume, as petitioner does, that owners of residential rental property and all other residential property owners are similarly situated, the question is whether the differential treatment is rationally related to a legitimate public purpose.

City's purported public purpose is to identify substandard and unsafe residential units and to ensure their rehabilitation or elimination. There is no dispute that such a purpose is a legitimate public purpose. Annual inspections of *all* property would advance that purpose. The rational basis for regular inspections of only rental properties is set forth in the Ordinance itself: City staff had observed that the most egregious violations occurred in the rentals.

Petitioner relies upon *College Area Renters & Landlord Assn. v. City of San Diego* (1996) 43 Cal.App.4th 677 [50 Cal.Rptr.2d 515], to support his equal protection claim but that case is distinguishable. *College Area Renters* held that an ordinance setting occupancy limits for rental dwellings was not rationally related to the city's purpose of minimizing overcrowding in the neighborhoods. The city had conducted a survey that supposedly showed that tenants were causing more overcrowding problems than homeowners were. The appellate court observed, however, that some overcrowding was attributable to owner-occupied homes. "If occupancy restrictions designed to mitigate neighborhood overcrowding problems are reasonably applied to tenants, they should just as reasonably be applicable to homeowners, and we can perceive of no justification for making a distinction between the two types of detached dwelling residents." (*Id.* at p. 687.) By way of example the appellate court elaborated: "[O]ne can envision a scenario of irrational differential treatment arising between two neighboring residences—one tenant-occupied and the other owner-occupied—with the tenant-occupied house being subject

to the ordinance even though its residents happen to be the quiet, neat type who use bicycles as their means of transportation, whereas the owner-occupied house is not subject to the ordinance, even though its residents happen to be of a loud, litter-prone, car-collecting sort." (*Id.* at pp. 686–687.) That is, the appellate court found tenants and homeowners to be similarly situated with regard to the occupancy ordinance and could find no rational basis for the differing treatment the ordinance imposed.

██ In the present case, unlike *College Area Renters*, one class of property owner cannot lawfully maintain a condition that is unlawful for the other class. Owner-occupied residences are subject to the same health, safety, and building standards to which nonowner-occupied dwellings are subject. Owner-occupied dwellings are also subject to inspection when a violation comes to the attention of City officials. (SCMC, § 4.02.040.) The only difference is that rental units are subject to regular inspections. The differential treatment—requiring registration and routine inspections of rental units only—meets the rational basis test because City could plausibly have concluded that regularly inspecting every residence would be overly burdensome on both City staff and most homeowners and that the more efficient way to promptly detect dangerous and unsanitary conditions would be to routinely inspect only the type of residence where the most egregious violations have previously been detected. There is no equal protection problem.

### D.  Legality of the Fees

██ Petitioner maintains that the fees associated with the Ordinance violate California Constitution, article XIII D (Proposition 218) in that they were enacted without a vote of the affected property owners. In *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 833 [102 Cal.Rptr.2d 719, 14 P.3d 930] (*Apartment Assn.*), the Supreme Court held that a city ordinance imposing an inspection fee on private landlords did not violate Proposition 218. The court observed that Proposition 218 applies to "taxes, assessments, fees, and charges . . . when they burden landowners *as landowners.*" (*Apartment Assn., supra*, at p. 842.) A rental inspection fee is imposed not because "a person owns property," but "because the property is being rented." (*Id.* at p. 838.) The fee is imposed "only on those landowners who choose to engage in the residential rental business, and only while they are operating the business." (*Id.* at p. 840.) Proposition 218 does not affect such fees. (24 Cal.4th at p. 842.) The holding is dispositive of the issue here.

██ Petitioner acknowledges *Apartment Assn.* but argues that Proposition 26 was enacted to undermine that ruling. We do not read Proposition 26 as affecting the *Apartment Assn.* analysis. As pertinent here, Proposition 26

added subdivision (e) to article XIII C, section 1 of the California Constitution. The new subdivision expanded the definition of "tax," to include "any levy, charge, or exaction of any kind imposed by a local government." (Cal. Const., art. XIII C, § 1, subd. (e).) Expressly excepted from that definition is "A charge imposed for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof." (Cal. Const., art. XIII C, § 1, subd. (e)(3).)

■ The concluding sentence of the newly added subdivision provides: "The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Cal. Const., art. XIII C, § 1, subd. (e).) This language repeats nearly verbatim the language of prior cases assessing whether a purported regulatory fee was indeed a fee or a special tax. As stated in *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1145–1146 [250 Cal.Rptr. 420], "A 'special tax' under section 4 [of California Constitution article XIII A] does not embrace fees charged in connection with regulatory activities which do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and are not levied for unrelated revenue purposes. [Citations.] [¶] . . . [T]o show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." (See *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 878 [64 Cal.Rptr.2d 447, 937 P.2d 1350].)

Recently in *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421 [121 Cal.Rptr.3d 37, 247 P.3d 112] (*California Farm Bureau*), the Supreme Court was called upon to determine the validity of a fee imposed upon water appropriators by the State Water Resources Control Board. Although the case did not concern Proposition 26, the court analyzed the language that originated with *San Diego Gas & Electric* and was later adopted by the drafters of Proposition 26. The question in *California Farm Bureau* was whether the state had produced evidence to show " ' "(1) the estimated costs of the service or regulatory activity, and

(2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' " (*California Farm Bureau, supra,* at pp. 436–437.) Because the statute at issue did not authorize the collection of any more than the administrative costs incurred, on its face the statute did not impose a tax. (*Id.* at pp. 439–440.) The Supreme Court explained: "The scope of a regulatory fee is somewhat flexible and is related to the overall purposes of the regulatory governmental action. . . . The question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payors. [Citation.] [¶] Thus, permissible fees must be related to the overall cost of the governmental regulation. They need not be finely calibrated to the precise benefit each individual fee payor might derive. What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection. An excessive fee that is used to generate general revenue becomes a tax." (*Id.* at p. 438.) The analysis is applicable here.

City carried its burden of proof, showing that the fees are not a tax. The fees are imposed to cover the cost of performing inspections. They are, therefore, expressly exempted from the Proposition 26 definition of "tax." City also offered evidence to show that the fees established by resolution do not exceed the approximate cost of the activity. Khoury's declaration explained that the cost of implementing the Ordinance would be about $321,000 per year plus "supervisory support and support from staff of other departments [such as Finance and Fire]." Khoury opined that these costs would be "equal to or greater than the fee(s) levied on rental property owners pursuant to the [Ordinance]." Khoury's declaration is sufficient to show that the amounts to be collected are "no more than necessary to cover the reasonable costs of the governmental activity." There was no conflicting evidence.

The fee schedule itself shows the basis for the apportionment, charging all landlords an annual $45 registration fee plus $20 per unit for inspections. Self-certifications, which would naturally cost City less to administer, are charged $20 per unit up to 20 percent of the units owned. Thus, a self-certifying landlord renting five units would pay a self-certification fee of $20 whereas inspection fees for five units would total $100. A significantly greater amount ($107 per hour) is charged when property conditions are such that reinspection is required. Considered collectively, the fees are reasonably related to the payors' burden upon the inspection program. The largest fees are imposed upon those whose properties require the most work. We conclude that the declaration of Director Khoury, combined with the fee schedule itself, show that the scheme imposes valid regulatory fees consistent with the requirements of Proposition 26.

## V. DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Elia, J., concurred.

A petition for a rehearing was denied August 15, 2012, and appellant's petition for review by the Supreme Court was denied October 10, 2012, S204948.