[No. D019929. Fourth Dist., Div. One. Feb. 5, 1996.]

COLLEGE AREA RENTERS AND LANDLORD ASSOCIATION,
Plaintiff and Respondent, v.
CITY OF SAN DIEGO et al., Defendants and Appellants.

## COUNSEL

John W. Witt, City Attorney, C. Alan Sumption and Leslie J. Girard, Chief Deputy City Attorneys, for Defendants and Appellants.

Asaro, Keagy, Freeland & McKinley and Timothy M. Barry for Plaintiff and Respondent.

Jordan C. Budd, A. Dale Manicom and Mark R. Lippman as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

HUFFMAN, J.—College Area Renters and Landlord Association (hereafter, CARLA) obtained a summary judgment in its favor, striking down City of San Diego Municipal Code section 101.0463 (hereafter sometimes referred to as the ordinance). We affirm the summary judgment, premised on our holding that the ordinance violates the equal protection clause of the California Constitution.[1] Although designed to address what is perhaps a legitimate problem of overcrowding of detached dwellings in certain single-family residential neighborhoods, the ordinance makes an irrational distinction between tenant-occupants and owner-occupants of those dwellings.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1985 residents formed a task force to evaluate the need for regulation due to overpopulation of single-family housing units in certain areas of the city. In 1986, the planning department was directed to conduct a survey to

---

[1] As we will discuss below, given our holding premised on equal protection principles, we need not decide other issues raised by the parties, including state preemption, Health and Safety Code procedural requirements, and constitutional privacy principles. However, we will touch upon these other issues for purposes of guidance in the event of future local legislative action.

determine the severity of the problems associated with "mini-dorms."[2] Surveys were randomly sent to residents in targeted areas. The survey instructed residents to answer questions pertaining to whether mini-dorms created a problem in their neighborhood, with mini-dorms defined as follows: " 'Mini-dorms' are detached houses in single-family neighborhoods (i.e. not apartments or condominiums) that are characterized by having so many residents that they create real problems for others in the neighborhood. These problems range from nuisance problems to true health and safety issues. While mini-dorms are sometimes associated with groups of students in rented houses, the problem may occur anytime there are more people living in a house than it was designed for and the lifestyle of the residents creates problems for their neighbors."

According to city planning department reports, 77 percent of the returned surveys reported no mini-dorm problem; 23 percent of the returned surveys reported a mini-dorm problem.[3] Of the surveys reporting a mini-dorm problem, 78 percent of these mini-dorms were identified as being occupied by tenants rather than owners. The reported problems included—in ranking order of frequency of complaints—parking; regular gathering place for many friends; number of people over age of 18 exceed number of bedrooms available; and lack of proper maintenance detracts from appearance of the neighborhood. Associated reported problems included noise, litter, property damage and traffic congestion.

In 1991, the city enacted Municipal Code section 101.0463.[4] The ordinance's stated purpose is to address nuisance problems associated with nonowner occupied rentals—including overcrowding and inadequate living space, lack of on-site and public street parking, excessive noise, litter, and inadequate property maintenance which adversely affects the character of one-family residential zones.

---

[2]These, and ensuing, facts are contained in various city planning department and city manager reports.

[3]Of the 5,000 surveys sent out, 1,017 were returned. From the college/state university area, 39 percent of the surveys were returned, and 33 percent of those returned surveys reported being affected by "mini-dorms." From the Navajo/Del Cerro area, 37 percent were returned, and 23 percent reported being affected. From the Pacific/Mission Beach area, 24 percent were returned, and 28 percent reported being affected.

[4]Premised on the survey and task force recommendations, the city first enacted (in 1987) San Diego Municipal Code section 101.0461, which established a single-family rental overlay zone (SFROZ) in targeted areas. In 1991, the city repealed this section and enacted the instant ordinance, entitled "One-Family Dwelling Rental Regulations"

The challenged ordinance regulates the number of persons over the age of 18 who may live in a non-owner-occupied residence in targeted areas.[5] That is, the ordinance limits the number of adult occupants of a rented one-family dwelling unit premised on the square footage of bedroom areas, the number and size of bathrooms, and the amount of off-street parking.[6]

As originally enacted in 1991, the square footage bedroom area requirements in the ordinance were more restrictive than statewide standards contained in the Uniform Housing Code.[7] Premised on a preemption holding in *Briseno* v. *City of Santa Ana* (1992) 6 Cal.App.4th 1378 [8 Cal.Rptr.2d 486], that the state had occupied the field of residential occupancy standards, the ordinance was amended in 1993 to conform with the room-size occupancy standards in the Uniform Housing Code. However, the amendment left untouched the ordinance's occupancy restrictions tied to the amount of bathroom and parking facilities.

The trial court granted CARLA's motion for summary judgment, striking down the ordinance on preemption and equal protection grounds.[8]

---

[5]The ordinance refers to "Map C-841" on file in the city clerk's office, which apparently consists of areas surrounding San Diego State University.

[6]The ordinance, as amended in February 1993, states:

"C. RENTAL REGULATIONS

"It shall be unlawful for an owner of real property in the R-1-5000 zone and located within the area designated on Map C-841 on file in the office of the City Clerk to rent, lease or allow to be occupied or subleased, for any form of consideration, any one-family dwelling unit, or portion thereof, in violation of any of the following development regulations:

"1. No such dwelling unit shall be occupied by more persons, over the age of eighteen (18), than is permitted by the most restrictive of the following regulations:

"a. Two (2) persons for each 70 square feet of shared bedroom area, plus one (1) additional person for each additional 50 square feet of bedroom area in bedrooms shared by more than two (2) persons, as provided for in Uniform Housing Code section 503; or

"b. Four (4) persons for each full or three-quarter bathroom and two (2) persons for each half bathroom; or

"c. One (1) person for each usable off-street parking space on the premises, developed, located and maintained in accordance with the provisions of Division 8 of this Article, plus one additional person; provided, however, that not more than two (2) parking spaces may be in tandem, nor more than one (1) curb cut per front yard, street side yard or alley be allowed for determining occupancy limits based on parking restrictions.

"2. No such dwelling or portion thereof, may be rented if it does not have at least one room, other than a bedroom, with a minimum of 120 square feet of habitable net floor space."

[7]That is, the original 1991 ordinance limited occupancy to 1 person for each 80 square feet of bedroom area, and required at least 1 room (not a bedroom) with 150 square feet, whereas the Uniform Housing Code standards are 70 square feet of bedroom area, plus 50 square feet for each bedroom occupant in excess of 2, and at least 1 room with 120 square feet.

[8]The trial court's order was premised on its conclusions the state had preempted the field of occupancy standards, plus the city's admission it had not made findings of local conditions

ANALYSIS

By way of introduction, we present a summary of the plethora of statutes and regulatory codes which are pertinent to this case.

Health and Safety Code section 17922,[9] subdivision (a) provides that: (1) building standards adopted by the Department of Housing and Community Development[10] pursuant to section 18935 et seq.[11] and (2) regulations contained in title 24 of the California Code of Regulations,[12] formerly California Administrative Code, shall impose substantially the same requirements as contained in the Uniform Housing Code.[13]

Although the statutory language is not a model of clarity, for purposes of section 17922, the definition of "building standard" can be read to include any rule which regulates not only the construction or alteration of a building,

---

necessary to support modification of statewide standards. Alternatively, the trial court concluded the ordinance violated equal protection principles, premised on its distinction between nonowner and owner occupants in the same neighborhood.

[9]Subsequent statutory references are to the Health and Safety Code unless otherwise specified.

[10]Section 17920, subdivision (e) defines "the department" referred to in section 17922 as the Department of Housing and Community Development.

[11]Section 18935 et seq., entitled "The California Building Standards Code," addresses the procedures for promulgating building standards by various state agencies.

See also section 18902, which states: "All references to the State Building Standards Code, Title 24 of the California Administrative Code shall mean the California Building Standards Code."

[12]The introduction to title 24 of the California Code of Regulations explains that title 24 is assigned to the California Building Standards Commission, which commission is responsible for coordinating all the building standards. The introduction explains that there are 26 titles in the California Code of Regulations, and each title is assigned to a state agency and contains all the regulations promulgated by that agency, except for the California Building Standards Commission.

[13]Section 17922 states in pertinent part: "(a) Except as otherwise specifically provided by law, *the building standards adopted and submitted by the department* for approval pursuant to chapter 4 (commencing with Section 18935) of Part 2.5 *and the other rules and regulations, which are contained in Title 24* of the California Administrative Code, adopted, amended, or repealed from time to time pursuant to this chapter *shall be adopted by reference*, except that the building standards and rules and regulations shall include any additions or deletions made by the department. *The building standards and rules and regulations shall impose substantially the same requirements as are contained in the most recent editions of* the following uniform industry codes as adopted by the organizations specified: (1) *The Uniform Housing Code* of the International Conference of Building Officials, except its definition of 'substandard building.' " (Italics added.)

but also *the method of use* of an existing building. (§§ 17920, 18909; see also § 17912.)[14]

The Department of Housing and Community Development's regulations (promulgated pursuant to § 18935 et seq.) are contained in title 25 of the California Code of Regulations. Section 32 of title 25 contains a section pertaining to existing buildings, indicating that the provisions of the Uniform Housing Code apply to existing buildings. (Cal. Code Regs., tit. 25, § 32;[15] see *Briseno* v. *City of Santa Ana, supra*, 6 Cal.App.4th at p. 1382 [state statutory scheme indicates that Uniform Housing Code governs occupancy standards].)

Title 24 of the California Code of Regulations centralizes the regulations governing building standards. (See *ante*, fn. 11.) Like title 25, title 24 contains provisions referring to existing buildings. Title 24 states that every building, whether existing or hereafter erected, shall be classified according to the character of its occupancy. (Cal. Code Regs., tit. 24, § 301.) Further, title 24 states that its provisions apply to the construction and occupancy and maintenance of one-family dwellings (Cal. Code Regs., tit. 24, § 331.2), and that its purposes include ensuring the safety of the public and of the occupants of the dwellings (Cal. Code Regs., tit. 24, § 331.1).

As indicated above, the Uniform Housing Code is the code which section 17922 instructs should be used in the regulations promulgated by the Department of Housing and Community Development (i.e., tit. 25), and in the centralized regulations contained in title 24. The Uniform Housing Code is a code adopted by the International Conference of Building Officials. (See § 17922, subd. (a)(1).) Uniform Housing Code section 503.2, formerly

---

[14]Section 17920 refers to section 18909's definition of building standard, which states: "(a) 'Building standard' means *any rule*, regulation, order, or other requirement, including any amendment or repeal of that requirement, *which specifically regulates*, requires, or forbids *the method of use*, properties, performance, or types of materials used in the construction, alteration, improvement, repair or rehabilitation *of a building*, structure, factory-built housing, or other improvement to real property, including fixtures therein, and as determined by the commission." (§ 18909, subd. (a), italics added.)

[15]The regulation states [Article 5, Existing Buildings; § 32, Space Occupancy, and Maintenance.]: "(a) Except as otherwise permitted or required by Health and Safety Code, Division 13, Part 1.5 and this subchapter, the provisions of the 1994 Edition of the Uniform Housing Code, Chapters 4, 5, and 6, and Section 701.2 and 701.3, as adopted by the International Conference of Building Officials, are hereby incorporated by reference and shall apply to buildings or structures subject to the provisions of this subchapter."

Division 13, part 1.5 of the Health and Safety Code is entitled "Regulation of Buildings Used for Human Habitation," and refers to section 17910 et seq.

section 503, subdivision (b) (chapter 5) sets occupancy standards tied to room size.[16]

Section 17958 provides that local governments may make changes in the uniform regulations adopted pursuant to section 17922, if the local governments follow certain procedures set forth in sections 17958.5 and 17958.7.[17] That is, section 17958.5 requires the local government to determine the changes "are reasonably necessary because of local climatic, geological, or topographical conditions."[18] Section 17958.7 requires the local government to make an express finding that such changes are reasonably necessary, which finding shall be available as a public record and filed with the

---

[16]The Uniform Housing Code states: "Floor Area. Dwelling units and congregate residences shall have at least one room which shall have not less than 120 square feet . . . of floor area. Other habitable rooms, except kitchens, shall have an area of not less than 70 square feet . . . . Where more than two persons occupy a room used for sleeping purposes, the required floor area shall be increased at the rate of 50 square feet . . . for each occupant in excess of two." (Uniform Housing Code, § 503.2.)

As indicated earlier, following the *Briseno* state preemption holding regarding occupancy standards, the city amended Municipal Code section 101.0463 to conform with the room size occupancy standards in the Uniform Housing Code. As we will mention again below, the amendment left untouched the ordinance's occupancy restrictions tied to the amount of parking and bathroom facilities.

[17]Section 17958 states: "Except as provided in Sections 17958.8 and 17958.9, *any city or county may make changes in the provisions adopted pursuant to Section 17922* and published in the State Building Standards Code or the other regulations thereafter adopted pursuant to Section 17922 to amend, add, or repeal ordinances or regulations which impose the same requirements as are contained in the provisions adopted pursuant to Section 17922 and published in the State Building Standards Code or the other regulations adopted pursuant to Sections 17958.5 and 17958.7. If any city or county does not amend, add, or repeal ordinances or regulations to impose those requirements or make changes or modifications in those requirements upon express findings, the provisions published in the State Building Standards Code or the other regulations promulgated pursuant to Section 17922 shall be applicable to it and shall become effective 180 days after publication by the commission. Amendments, additions, and deletions to the State Building Standards Code adopted by a city or county pursuant to Section 17958.7, together with all applicable portions of the State Building Standards Code, shall become effective 180 days after publication of the State Building Standards Code by the State Building Standards Commission." (Italics added.)

(Sections 17958.8 and 17958.9 pertain to alterations of existing buildings and movement of dwellings, and are not pertinent to this case.)

[18]Section 17958.5, subdivision (a), states: "Except as provided in Section 17922.6, in adopting the ordinances or regulations pursuant to Section 17958, *a city or county may make such changes or modifications in the requirements* contained in the provisions published in the California Building Standards Code and the other regulations adopted pursuant to Section 17922 as it determines, pursuant to the provisions of Section 17958.7, are *reasonably necessary because of local climatic, geological, or topographical conditions.*

"For purposes of this subdivision, a city and county may make reasonably necessary modifications to the requirements, adopted pursuant to Section 17922, contained in the provisions of the code and regulations *on the basis of local conditions.*" (Italics added.)

Department of Housing and Community Development.[19] (See *ABS Institute v. City of Lancaster* (1994) 24 Cal.App.4th 285, 288 [29 Cal.Rptr.2d 224].)[20]

In addition to these provisions governing the procedure by which local governments may deviate from the uniform standards, the Health and Safety Code contains a provision acknowledging the local government's zoning power. That is, section 17922, subdivision (b), states that except as provided in section 17959.5, local use zone requirements are reserved to the local jurisdictions notwithstanding any requirements set forth in this part of the Health and Safety Code.[21] Section 17959.5 confers power upon the housing appeals board (in addition to the variance power of other local governmental agencies), to grant variances from local use zone requirements in order to permit an owner-occupant of a dwelling to construct an addition to meet occupancy standards relating the number of persons in a household to the number of rooms or bedrooms.[22]

---

[19]Section 17958.7 states: "(a) Except as provided in Section 17922.6, *the governing body of a city or county*, before making any modifications or changes pursuant to Section 17958.5, *shall make an express finding that such modifications or changes are reasonably necessary because of local climatic, geological or topographical conditions.* Such a finding shall be available as a public record. A copy of such findings, together with the modification or change expressly marked and identified to which each such finding refers, shall be filed with the department. No such modification or change shall become effective or operative for any purpose until the finding and the modification or change have been filed with the department.

"(b) The department may reject a modification or change filed by the governing body of a city or county if no finding was submitted." (Italics added.)

(Section 17922.6, not relevant to this case, addresses noise insulation standards in dwellings other than detached single-family dwellings.)

[20]The *ABS Institute* case contains a succinct summary of this complex statutory scheme: "The state, through the Department of Housing and Community Development (HCD), reviews national model uniform codes and promulgates modifications which, in turn, are reviewed and approved by the California Building Standards Commission (and are then referred to as the California Building Standards Code). (§§ 17922, 18930, 18935.) Uniformity is achieved by requiring all cities and counties to adopt the uniform building codes, as modified by the HCD, as their local building codes. (§§ 17958, 18941.5.) Local modifications are permitted only as allowed by sections 17958.5 and 17958.7." (*ABS Institute* v. *City of Lancaster, supra,* 24 Cal.App.4th at p. 289.)

The court in *ABS Institute* upheld a city's deviation from statewide standards pertaining to plumbing pipes, upon sufficient findings made under sections 17958.5 and 17958.7.

[21]Section 17922, subdivision (b), states: "Except as provided in Section 17959.5, *local use zone requirements*, local fire zones, building setback, side and rear yard requirements, and property line requirements are *hereby specifically and entirely reserved to the local jurisdictions notwithstanding any requirements found or set forth in this part.*" (Italics added.)

[22]Section 17959.5 states: "The housing appeals board may, upon appeal or upon application by the owner, grant variances from local use zone requirements in order to permit an owner-occupant of a dwelling to construct an addition to a dwelling to meet occupancy standards relating the number of persons in a household to the number of rooms or bedrooms. This power of the housing appeals board shall be in addition to, and shall not otherwise affect, the powers of other governmental boards and agencies to allow local use zone variances."

I

EQUAL PROTECTION

██ Although we are sympathetic to the city's attempt to respond to problems associated with overcrowding in certain single-family residential neighborhoods, we agree with CARLA and amicus curiae American Civil Liberties Union that the instant ordinance violates California equal protection principles, to the extent it differentiates between owner-versus nonowner-occupied residences. ██ Although equal protection does not demand that a statute apply equally to *all* persons, it does require that persons *similarly situated* with respect to the legitimate purpose of the law receive like treatment. (*In re Antazo* (1970) 3 Cal.3d 100, 110 [89 Cal.Rptr. 255, 473 P.2d 999]; *Elysium Institute, Inc.* v. *County of Los Angeles* (1991) 232 Cal.App.3d 408, 427 [283 Cal.Rptr. 688].) If a statute is found to discriminate between similarly situated persons, the classification (in ordinary cases) must bear a rational relationship to a legitimate state purpose, or (in cases involving suspect classes or fundamental interests) must be necessary to further a compelling state interest. (*Elysium*, *supra*, 232 Cal.App.3d at p. 427; *Vehicular Residents Assn.* v. *Agnos* (1990) 222 Cal.App.3d 996, 999 [272 Cal.Rptr. 216].) Under the traditional, rational relationship test, the court conducts an inquiry into the correspondence between the classification and the legislative goals. (*Elysium*, *supra*, 232 Cal.App.3d at p. 427.) A zoning ordinance may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. (*Id.* at pp. 427-428.)

██ Here, the purpose of the law is to address problems associated with excessive occupancy of detached homes in a single-family residence zone. Owners and tenants are similarly situated with respect to the overcrowding problem—i.e., both groups can overcrowd a neighborhood. Assuming arguendo (without addressing the issue) that this case only requires use of the rational relationship test, we are not persuaded that there is a sufficient relationship between the non-owner-occupied classification and the overcrowding problem, so as to justify imposing occupancy restrictions on tenant residents that do not apply to neighboring owner residents.

To illustrate, one can envision a scenario of irrational differential treatment arising between two neighboring residences—one tenant-occupied and the other owner-occupied—with the tenant-occupied house being subject to

the ordinance even though its residents happen to be the quiet, neat type who use bicycles as their means of transportation, whereas the owner-occupied house is not subject to the ordinance, even though its residents happen to be of a loud, litter-prone, car-collecting sort.

Moreover, assuming arguendo the survey results sufficiently show that tenants currently cause more overcrowding problems than homeowners in any particular area, this does not mean some homeowners do not, or will not in the future, make a significant contribution to the overcrowding problem. (Indeed, the city's data indicates 22 percent of neighborhood overcrowding in the surveyed areas is attributed to occupancy which includes homeowners.) If occupancy restrictions designed to mitigate neighborhood overcrowding problems are reasonably applied to tenants, they should just as reasonably be applicable to homeowners, and we can perceive of no justification for making a distinction between the two types of detached dwelling residents.

We are not persuaded by the city's citation to *Ewing* v. *City of Carmel-by-the-Sea* (1991) 234 Cal.App.3d 1579, 1591, 1596 [286 Cal.Rptr. 382], a case which upholds a local ordinance prohibiting "transient commercial use of residential property" (i.e., short-term rentals) for less than 30-day periods in a single-family residential neighborhood. The ordinance in *Ewing* was found to be rationally related to the goal of maintaining the residential character of the area, without classifying between different types of *transient* commercial use of property. Here, the ordinance applies to all renters, regardless of the length of their tenancy, and we view these tenants as similarly situated to owners, for purposes of the goal of controlling neighborhood overcrowding.

In short, if the city wants to address problems associated with overcrowded detached homes, it should do so with a law that applies "evenly to all households." (See *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 133 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].) As stated by our Supreme Court in *Adamson*: "Population density can be regulated by reference to floor space and facilities. Noise and morality can be dealt with by enforcement of police power ordinances and criminal statutes. Traffic and parking can be handled by limitations on the number of cars (applied evenly to all households) and by off-street parking requirements. *In general, zoning*

*ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users.*" (*Ibid.*, italics in original.)[23]

## II

## PREEMPTION

Given our holding on equal protection grounds, we need not resolve the parties' dispute over whether the ordinance is preempted by state residential occupancy laws. We do note, however, that case precedent indicates the Legislature has legitimately occupied the field in the area of residential occupancy standards. (*Briseno v. City of Santa Ana, supra,* 6 Cal.App.4th at pp. 1381-1383.)

Indeed, as noted earlier, the city's 1993 amendment of the ordinance was expressly designed to conform with the preemption holding in *Briseno.* Although the 1993 amendment changed the ordinance's occupancy standards tied to room size to conform with the Uniform Building Code, it left standing the occupancy limits tied to the amount of bathroom and parking facilities.

*Briseno, supra,* struck down a local ordinance, which—with an aim to address overcrowding—required more floor space per occupant than the state standard. *Briseno* traces the history of the state's housing laws, including a legislative declaration indicating the desire for uniformity in order to help meet the population's housing needs.[24]

■ *Briseno v. City of Santa Ana, supra,* 6 Cal.App.4th 1378 concludes that the state has evinced an intent to preempt the field of occupancy

---

[23]On constitutional privacy grounds, *Adamson* struck down a local ordinance which imposed a numerical limitation on the number of nonfamily-related persons who could live together in a single-family zone.

[24]Amending the Health and Safety Code in 1970 to provide for uniformity, the Legislature stated: " 'The Legislature hereby finds and declares that the uniformity of codes throughout the State of California is a matter of statewide interest and concern since it would reduce housing costs and increase the efficiency of private housing construction industry and its production.

" 'Uniformity can be achieved within a framework of local autonomy, by allowing local governments to adopt changes making modifications in such codes based on differences in local conditions, but requiring express findings as reasons for those changes which would serve as a deterrent to the excessive adoption of changes or modifications.

" 'Thus, such uniformity, by bringing about such reduction of costs and increase of efficiency, would substantially help to meet the housing needs within this state.' " (Historical Note, 40A West's Ann. Health & Saf. Code (1984 ed.) § 17951, p. 390, quoting Stats. 1970, ch. 1436, § 7.)

standards, and that although a local government has the power to enact occupancy standards which differ from the state standards, it must follow the specific procedures set forth in the Health and Safety Code. (*Id.* at pp. 1380-1383.) *Briseno* points out that the ordinance was contrary to a level of occupant density which the state has determined is safe; it would force larger families out of their dwellings and into communities which do follow the Uniform Housing Code; this in turn could exacerbate housing shortages statewide; and it must be presumed that the Legislature had balanced the benefits of the statewide standard against the burdens it might impose on local governments faced with overcrowding problems. (*Id.* at pp. 1385-1386.)

The city acknowledges that state law preempts occupancy standards for construction of new, and inhabitation of existing, buildings in order to ensure minimum standards of habitability. The city argues, however, that these occupancy standards do not preempt the instant ordinance, since the latter is a zoning ordinance which only restricts the business of renting in order to address overcrowding, and does not address the habitability of buildings.

The city cites our Supreme Court precedent which, in the context of charter cities, requires, as a threshold question, identification of an actual conflict between the state and local law. (See *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1, 16-17 [283 Cal.Rptr. 569, 812 P.2d 916]; *Johnson* v. *Bradley* (1992) 4 Cal.4th 389, 400-401 [14 Cal.Rptr.2d 470, 841 P.2d 990]; *Barajas* v. *City of Anaheim* (1993) 15 Cal.App.4th 1808, 1813-1817 [19 Cal.Rptr.2d 764].) If a conflict is found, the inquiry then focuses on an evaluation of whether there is a convincing basis for state legislative action originating in extramural concerns, so as to justify a legislative supersession based on sensible, pragmatic concerns, and with a recognition that the state's protective measures should be no broader than its interests. (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles, supra,* 54 Cal.3d at pp. 18, 25; *Johnson* v. *Bradley, supra,* 4 Cal.4th at pp. 400, 405.) In short, even if the Legislature has attempted to deal with a particular subject on a statewide basis, there must be good reasons, grounded on statewide interests, to label a given matter of "statewide concern," so as to interfere with local "home rule" (charter city) powers. (*Johnson* v. *Bradley, supra,* 4 Cal.4th at p. 405; *Barajas* v. *City of Anaheim, supra,* 15 Cal.App.4th at pp. 1817-1820.)

Arguably, here, a conflict exists between the state occupancy standards (tied to room size) and the instant ordinance, since the bathroom and parking

standards contained in the ordinance directly limit the number of occupants of a dwelling, which in turn impacts the availability of housing for the state's population.[25] Since we need not resolve the preemption issue, we will assume for the sake of the following discussion that such a conflict does exist.

The local ordinance before us addresses neighborhood overcrowding by means of occupancy standards for individual dwellings. Although we need not decide the issue, we do note that the language of section 17922, subdivision (b), indicates a Legislative intent to emphasize that notwithstanding the enactment of statewide, uniform building standards, local governments retain local use zoning power. Arguably—even without considering the legitimacy of the state's occupation of the occupancy field under the *California Fed., supra,* analysis—subdivision (b) of section 17922 suggests that local ordinances which address neighborhood overcrowding could, at least to some extent, stand independently as local zoning laws, regardless of the statewide uniform standards for individual dwellings.

On the other hand, the Legislature's intent to preempt residential occupancy standards emerges with some force when the statutory scheme (delineated above) is viewed as a whole. Furthermore, as pointed to in *Briseno* v. *City of Santa Ana, supra,* 6 Cal.App.4th 1378, the argument is strong that—premised in part on its concern to meet the housing needs of the state's population—the state has good reason for enactment of uniform occupancy standards which preempt local occupancy ordinances.

This reasoning would support a conclusion that a city's concerns with overcrowding should be addressed in a manner which conforms with the statewide laws, at least to the extent the latter are concerned with meeting the population's housing needs. Thus, it would follow that even a charter city such as San Diego should follow the state standards and procedures in this arena, to the extent the city chooses to address neighborhood overcrowding via occupancy standards.

III

PROCEDURAL COMPLIANCE

Also unnecessary to our affirmance of the summary judgment, is the question of whether the city did substantially comply with the mandate in

---

[25]The parties on appeal do not discuss sanitation or parking standards independent of the instant ordinance.

sections 17958.5 and 17958.7, that a local government render and file a finding with the Department of Housing and Community Development prior to modifying otherwise uniform, statewide standards. Assuming arguendo preemption applies to the instant ordinance, the city argues that the survey and various planning commission and city council hearings provide ample basis to support the ordinance.[26] Given that the ordinance must be struck down on equal protection grounds, we decline to address this issue of procedural compliance.[27]

The city alternatively argues that even absent findings, an assumption can properly be made that tenant residents are the cause of the overcrowding problem. Although we question whether such an assumption can bypass the clearly stated Health and Safety Code procedural requirements, in any event, (as we discussed earlier) the assumption sweeps too broadly, since the ordinance irrationally restricts tenants who might *not* crowd, while failing to restrict owners who, indeed, *might* crowd.

## IV

### PRIVACY

Finally, since we hold the ordinance must be struck down on equal protection grounds premised on its irrational distinction between tenant-residents and owner-residents, we need not reach the constitutional privacy challenge raised by CARLA and amicus curiae. ■ We do note, however, that any laws which involve intrusion into the inhabitation of bedrooms and living rooms would likely trigger privacy concerns. As stated by our Supreme Court, the right to privacy includes the right to be left alone *in our homes*, and this right should be abridged only when there is a compelling public need. (*City of Santa Barbara* v. *Adamson, supra*, 27 Cal.3d at p. 130.)

In sum, we hold that the local ordinance before us, designed to address neighborhood overcrowding, can not survive equal protection muster, since it irrationally distinguishes between owner-and non-owner-occupied residences.

---

[26]There is no dispute that the city in fact did *not* render and file findings as required under sections 17958.5, subdivision (a) and 17958.7, subdivision (a).

[27]As delineated earlier, sections 17958.5, subdivision (a) and 17958.7, subdivision (a) require the local government to render and file a finding indicating that local "climatic, geological, or topographical conditions" require unique local laws.

We need not evaluate the scope of the "local conditions" which allow for deviation from the otherwise uniform statewide occupancy standards. (See generally, *ABS Institute* v. *City of Lancaster, supra*, 24 Cal.App.4th at pp. 293-294; 72 Ops.Cal.Atty.Gen. 180, 184-186 (1989).)

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Work, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 1, 1996. Kennard, J., was of the opinion that the petition should be granted.