2005 UT 5

**Jerald and Bonnie ANDERSON, Michael Johnston, Sheila Johnston, Jonathan Myres, Jim Tills, Gigi Tills, Plaintiffs and Appellants,**

v.

**PROVO CITY CORP., Defendant and Appellee.**

**No. 20030679.**

Supreme Court of Utah.

Jan. 21, 2005.

Bruce R. Baird, Salt Lake, for plaintiffs.

David C. Dixon, Provo, Jody K. Burnett, Salt Lake, for defendants.

DURHAM, Chief Justice:

¶ 1 The City of Provo amended a zoning ordinance governing residential neighborhoods near Brigham Young University to allow only those homeowners who reside in their homes to rent out "accessory" apartments. A group of homeowners brought suit challenging the amendment, and the district court granted summary judgment to Provo. In this appeal of that decision, the homeowners argue that the amended ordinance (1) exceeds Provo's legislative authority by regulating land ownership rather than land use, (2) violates the equal protection guarantees of the United States and Utah Constitutions, (3) is an invalid restraint on the alienation of property, and (4) unconstitutionally burdens the right to travel. We affirm.

## REGULATORY AND PROCEDURAL BACKGROUND

¶ 2 The history of zoning regulations in the area around Brigham Young University (BYU), located in Provo, reveals the city's longstanding concern with accommodating the university's need for student housing while maintaining the character of residential neighborhoods.[1] The earliest regulation described in the record, dating back to at least 1959, allowed up to four boarders in a single-family dwelling as long as the house's construction did not reveal the boarders' presence or provide them with separate cooking facilities.

¶ 3 In 1974, the general structure of the current zoning scheme was put into place. Under this scheme, portions of the Wasatch and Pleasant View neighborhoods near BYU are zoned as single-family neighborhoods,[2] but supplementary residential overlay (S Overlay) provisions allow residents in these neighborhoods to construct accessory apartments in their basements or upper floors and rent these apartments to up to four occupants, often students.[3] The Provo City Code describes the purpose of the S Overlay provisions thus:

> to recognize the unique character of Provo City as a "university community" and to

---

1. After BYU established an off-campus housing program in 1951, the university's enrollment rose from 5000 to 21,000 by 1966, with most of the additional students finding off-campus accommodation. As of 1999, the off-campus housing office listed 4629 approved off-campus apartments, most of which were then occupied by students of BYU and other area colleges and universities.

2. The rules governing these single-family residential (R1) zones are laid out in Provo City Code sections 14.10.010 to .150 (2004).

3. In its earliest form, the S Overlay allowed owners to request a conditional use permit in order to use their houses as duplexes. The permit requirement was eventually replaced with the generally applicable accessory apartment allowance. *See* Provo City Code §§ 14.30.010-.090 (2004). The Wasatch and Pleasant View neighborhoods are the only areas in Provo where the S Overlay provisions apply. The S Overlay applies to seventy-five percent of the Pleasant View neighborhood and approximately half of the Wasatch neighborhood.

accommodate supplementary living accommodations in some appropriate single family residential areas of the community. The[ ] [S Overlay] provisions are intended to meet community demands for residential accommodations for semitransient residents in areas of the community adjacent to major educational and institutional uses. This overlay zone is designed to provide an alternative living environment for said semi-transient residents to that normally found within the higher density multiple residential zones. The (S) overlay zone will therefore protect and enhance the desirable aesthetic characteristics of the underlying single family residential zone.... The sole function of the overlay is to permit alternate methods of housing the occupancy otherwise permitted in an R1 [single-family residential] zone.

Provo City Code § 14.30.010.

¶ 4 Until the 2000 amendment under review in this case, owners with accessory apartments were not required to live in the primary residence in order to rent the apartment. Thus, owners could have two sets of tenants in such a dwelling: one, meeting the definition of "family" under the Provo zoning laws, occupying the primary residence; and another, whose identity the zoning laws did not restrict but who were likely to be university students, occupying the accessory apartment. In addition, there was no limit on how many such dwellings a single owner could possess.

¶ 5 In 1997, some owners in the Wasatch and Pleasant View neighborhoods began an effort to replace the S Overlay with an accessory apartment overlay (A Overlay), which would restrict the ability to rent out accessory apartments to those owners who occupy the primary residence. *See Id.* § 14.46.030(2)(d)(i). However, the petition requesting adoption of the A Overlay failed to garner the signatures necessary to bring the proposal before the city planning commission. *See id.* § 14.46.060(1)(c) (requiring seventy percent of property owners within the affected area to sign such a petition). In 1999, these owners decided to pursue an alternative means of establishing an owner occupancy requirement in their neighborhoods, bypassing the signature requirement by proposing a textual amendment to the S Overlay provision itself. *See id.* § 14.02.020.

¶ 6 Following neighborhood meetings and a public hearing, the Provo City Planning Commission staff issued a report on January 26, 2000 recommending that the owner occupancy requirement be approved. The report suggested that limiting accessory apartment rental to owner occupants would promote the original purpose of the S Overlay, which, since its establishment, had been undermined by difficulties in enforcing congestion and nuisance problems. Although accessory apartments attached to owner occupied residences also contributed to these problems, the report noted that "as a general trend there seems to be a higher rate of violations at property where the owner does not reside." The report also indicated the neighborhood residents' feeling "that the[ir] stability is disintegrating one home at a time from what was once a predominantly affordable family owner occupied neighborhood." The proposed amendment was thus intended to "prohibit[ ] outside investors from targeting these neighborhoods[,] buying up homes and essentially creating duplexes that do not contribute to overall stability of the neighborhood."

¶ 7 An ad hoc technical committee was then appointed, and an independent consultant retained, to consider the length of the transition period, after which those currently not in compliance with the proposed owner occupancy requirement would have to comply. The commission staff subsequently revised its report to recommend that the period be at least five years. On April 4, 2000, the Provo City Municipal Council held a public hearing and, following extensive public comment and discussion, voted unanimously to adopt a modified version of the commission's proposal. The approved amendment was put into effect by ordinance 2000–15. The ordinance amended the S Overlay provisions in Provo City Code section 14.30, giving nonconforming owners until at least April 4, 2003 to comply with the revised occupancy requirements, which now read as follows with subsections (c) and (d) added by ordinance 2000–15:

Occupancy: For purposes of a one family dwelling with an accessory dwelling unit, . . . the following occupancy rules shall apply:

(a) One of the dwelling units within the structure shall be occupied by:

(i) One (1) person living alone; or

(ii) The head of household and all persons related to the head of household by marriage or adoption as a parent, child, grandchild, brother, sister, uncle, aunt, nephew, niece, great-grandparent or great-grandchild. For purposes of this paragraph, two (2) or more of these persons must share the legal relationship of husband and wife, or parent and child or grandparent and child. Such parent or grandparent must actually reside in the subject dwelling.

(b) The remaining dwelling unit within the structure shall be occupied by no more than four (4) related or unrelated persons.

(c) One of the dwelling units within the structure shall be occupied by the owner of the property. Owner occupancy shall not be required when:

(i) The owner has a bona fide, temporary absence of three (3) years or less for activities such as temporary job assignments, sabbaticals, or voluntary service. Indefinite periods of absence from the home shall not qualify for this exception.

(ii) The owner is placed in a hospital, nursing home, assisted living facility or other similar facility.

(d) Owner occupancy as defined in this section shall mean:

(i) a human being who possesses more than fifty (50) percent ownership in the dwelling and said dwelling is the primary residence of the owner; or

(ii) a family trust whose primary purpose is for estate planning by one or more trustors who create the trust, place the dwelling in such trust and whose primary residence is such dwelling.

Provo City Code § 14.30.030(2).

¶ 8 A group of homeowners (Owners) affected by the amendment brought suit against Provo on April 4, 2001, seeking either to overturn ordinance 2000–15 as facially invalid or to obtain compensation for their investment losses through as-applied claims. The Owners and Provo filed cross-motions for partial summary judgment on the Owners' facial challenges. On July 14, 2003, following a hearing, the district court granted Provo's motion and denied the Owners' motion. Pursuant to the stipulation of the parties, the court then dismissed the Owners' as-applied challenges without prejudice, thus rendering its summary judgment a final order in the case, and stayed the effective date of ordinance 2000–15 pending a decision on appeal.

¶ 9 The Owners filed a direct appeal in this court. We have jurisdiction pursuant to Utah Code section 78–2–2. Utah Code Ann. § 78–2–2(3)(j) (2002); *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 35, 70 P.3d 47 (holding the supreme court has original appellate jurisdiction "over district court review of land use decisions by local governmental entities").

## STANDARD OF REVIEW

¶ 10 Summary judgment is appropriate only where there are no genuine issues of material fact. *Sandy City v. Salt Lake County*, 827 P.2d 212, 217 (Utah 1992). "Because summary judgment is granted as a matter of law rather than fact, we are free to reappraise the trial court's legal conclusions," reviewing them for correctness. *Id.* at 218. In doing so, "we view the [undisputed] facts in a light most favorable to the party against which the motion was granted." *Id.* at 215.

## ANALYSIS

### I. PROVO'S AUTHORITY TO ISSUE ORDINANCE 2000–15

¶ 11 The Owners first argue that Provo exceeded its statutory authority in issuing ordinance 2000–15. Specifically, they maintain that an owner occupancy prerequisite to accessory apartment rental restricts who may own houses located within the S Overlay zone and thus impermissibly transforms the ordinance into a regulation of land ownership rather than land use. This issue is one of

statutory interpretation, which we consider de novo. *Green v. Turner*, 2000 UT 54, ¶ 5, 4 P.3d 789 (stating that whether a county commission acted within its statutory authority was a matter of statutory interpretation); *Sandy City*, 827 P.2d at 218 (stating that whether a county "overstepped the bounds of its legislatively delegated authority" was a "pure question[ ] of law" that depends on statutory interpretation).

¶ 12 We have long recognized that a city's zoning power "is of necessity confined by the limitations fixed in the grant by the state, and to accomplishment of the purposes for which the state authorized the city to zone." *Marshall v. Salt Lake City*, 105 Utah 111, 141 P.2d 704, 708 (1943); *see Hatch v. Boulder Town Council*, 2001 UT App 55, ¶ 7, 21 P.3d 245 ("The authority to regulate land use through zoning ordinances is conferred on municipalities by the state through enabling statutes."); *see also Provo City v. Ivie*, 2004 UT 30, ¶ 12, 94 P.3d 206 (recognizing that Provo "was created and functions pursuant to the laws enacted by the legislature in the Utah Municipal Code"). Our state legislature has granted a city's legislative body the power to "enact a zoning ordinance establishing regulations for land use and development that furthers the intent of [The Municipal Land Use Development and Management Act, Utah Code Ann. §§ 10–9–101 to–1003 (2003 & Supp.2004)]." Utah Code Ann. § 10–9–401 (2003). This statutory language forms the basis for the Owners' argument that the zoning ordinance at issue here, by regulating land "ownership," goes beyond the power conferred on cities by the state to regulate land "use."

■ ¶ 13 We reject the proposition that placing an owner occupancy condition on a supplementary accessory dwelling use constitutes an impermissible regulation of "ownership." Such a condition is not the type of ownership restriction that other courts have disapproved. "[A]s a practical matter, many zoning laws extend beyond the mere regulation of property to affect the owners and users thereof." *Kasper v. Town of Brookhaven*, 142 A.D.2d 213, 535 N.Y.S.2d 621, 626 (N.Y.App.Div.1988). However, only those laws that "single[ ] out [an identifiable indi-

vidual] for special treatment," *Village of Valatie v. Smith*, 83 N.Y.2d 396, 610 N.Y.S.2d 941, 632 N.E.2d 1264, 1268 (1994), or otherwise "place the *emphasis* on the regulation of the person rather than the land," *Vlahos Realty Co. v. Little Boar's Head Dist.*, 101 N.H. 460, 146 A.2d 257, 260 (1958) (emphasis added), qualify as per se ad hominem restrictions that exceed a local government's zoning power. *See Anza Parking Corp. v. City of Burlingame*, 195 Cal.App.3d 855, 241 Cal. Rptr. 175, 177 (1987) (holding invalid a nontransferability condition on a use permit because it made the permit a "mere license or privilege to an individual [which did] not relate in its proper sense to the use of the property").

¶ 14 As the Owners point out, one treatise has suggested that a zoning law that "distinguish[es] between owner-occupied and rental housing" may be considered an invalid ad hominem restriction. 5 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 81.7 (4th ed.2002). However, the treatise clarifies that this suggestion does not necessarily apply to an owner occupancy restriction on "specially permitted" uses, such as those granted to individuals under a variance or conditional use permit, as long as the restriction is " 'reasonably related to the purposes underlying the zoning code.' " *Id.* (quoting *Finger v. Levenson*, 163 A.D.2d 477, 558 N.Y.S.2d 163, 165 (N.Y.App.Div.1990)).

■ ¶ 15 For purposes of our analysis here, we believe the generally-applicable owner occupancy restriction imposed by the S Overlay amendment is equivalent to an individually-applicable owner occupancy restriction on a variance or conditional use permit that allows an otherwise prohibited use. Like the latter, the restriction here does not prevent nonoccupying owners from renting their houses for single-family residential use; it merely prevents such owners from engaging in the supplemental activity of renting accessory dwellings—an activity that would not be permitted at all in the absence of the S Overlay provisions. Because the restriction serves to control only this supplemental use while not interfering with any owner's use of his primary residence, we believe the restriction is reasonably related

to the underlying purposes of Provo's land use regulation. *Cf. Sounhein v. City of San Dimas*, 47 Cal.App.4th 1181, 55 Cal.Rptr.2d 290, 296 (1996) (recognizing an owner occupancy requirement on a conditional use permit for construction of a second unit "as a strategy to minimize the adverse effects" of granting the permit while promoting its primary purpose "to create more affordable housing in existing neighborhoods").

¶ 16 We therefore hold that the S Overlay amendments effected by ordinance 2000–15 constitute land use regulations within the zoning power of the Provo City Municipal Council. Our further review of the ordinance is governed by Utah Code section 10–9–1001, which requires courts to "presume that land use ... regulations are valid" and to "determine only whether or not the [regulation] is arbitrary, capricious, or illegal." Utah Code Ann. § 10–9–1001(3); *see Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 22, 979 P.2d 332. The Owners do not argue that the ordinance is arbitrary or capricious.[4] However, they do argue that the ordinance is illegal because it violates their rights to equal protection and uniform operation of the law, the public policy against restraints on the alienation of property, and their right to travel. We thus turn to consider whether the ordinance is illegal for any of these reasons.

## II. EQUAL PROTECTION AND UNIFORM OPERATION OF LAWS

■ ¶ 17 The Owners contend that the owner occupancy prerequisite to accessory dwelling rental impermissibly distinguishes between occupying and nonoccupying owners in the Wasatch and Pleasant View neighborhoods, in violation of the uniform operation of laws provision of article I, section 24 of the Utah Constitution and the equal protection provision of the Fourteenth Amendment to the United States Constitution. These two provisions "embody the same general principle." *Gallivan v. Walker*, 2002 UT 89, ¶ 31, 54 P.3d 1069 (internal quotation omitted). However, " 'our construction and application of [our state constitutional provision] are not controlled by the federal courts' construction and application of the Equal Protection Clause.' " *Id.* at ¶ 33 (quoting *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984)). We have previously observed that "Utah's uniform operation of laws provision is 'at least as exacting and, in some circumstances, more rigorous than the standard applied under the federal constitution.' " *Id.* (quoting *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 889 (Utah 1988)). Since, as discussed below, we hold that the Provo ordinance's owner occupancy requirement does not violate the uniform operation of laws provision, we analyze the Owners' claim with regard to that provision only and need not conduct a separate analysis under the federal equal protection provision. *See State v. Schofield*, 2002 UT 132, ¶ 18 n. 3, 63 P.3d 667.

■ ¶ 18 The "essence" of the uniform operation of laws provision[5] of the Utah Constitution is that a legislative body must not "classify[ ] persons in such a manner that those who are similarly situated with respect to the purpose of the law are treated differently by that law, to the detriment of some of those so classified." *Gallivan*, 2002 UT 89 at ¶ 36, 54 P.3d 1069 (internal quotation omitted). The provision forbids "singl'[ing] out one person or group of persons from among the larger class [of those similarly situated] on the basis of a tenuous justification that has little or no merit." *Id.* at ¶ 37 (internal

---

**4.** We therefore need not address the ordinance's validity under the framework laid out in *Bradley*, 2003 UT 16 at ¶¶ 14–15, 70 P.3d 47 (describing our application of the arbitrary and capricious standard to municipal land use disputes). Provo City urges us to apply a "reasonably debatable" standard when reviewing the constitutionality of the ordinance. We again clarify, however, as we previously clarified in *Bradley*, that we apply the "reasonably debatable" standard when determining whether a municipality's legislative decision

is arbitrary and capricious. *Id.* at ¶ 10. When determining whether a municipal action is otherwise illegal, we apply the standard appropriate to the particular claim of illegality. *See Gardner v. Perry City*, 2000 UT App 1, ¶ 9 & n. 3, 994 P.2d 811 (recognizing the distinction between arguing illegality and arguing arbitrariness and capriciousness).

**5.** Utah Const. art. I, § 24 ("All laws of a general nature shall have uniform operation.").

quotation omitted). We review the constitutionality under the uniform operation of laws provision of, in this case, a city ordinance to determine, first, " 'what classifications ... are created by the [ordinance]' "; second, whether the different classes " 'are treated disparately' "; and third, whether the municipal council " 'had any reasonable objective that warrants the disparity.' " *Schofield*, 2002 UT 132 at ¶ 12, 63 P.3d 667 (quoting *State v. Mohi*, 901 P.2d 991, 997 (Utah 1995)).[6]

¶ 19 The S Overlay amendment does distinguish between homeowners on the basis of whether they occupy their residence or not. *See* Provo City Code § 14.30.030(2)(c). The resulting two classes—occupying and nonoccupying owners—are treated differently, the former allowed to engage in the supplementary use of renting accessory dwellings and the latter prohibited from doing so unless one of the stated exceptions applies. *Id.* Nevertheless, we uphold the amendment because we conclude that the disparity in treatment is reasonably justified by the Provo City Municipal Council's stated objective of balancing the city's competing interests in accommodating student housing needs and in preserving the character of single-family residential neighborhoods.

¶ 20 As described above, the record before us indicates that the Provo City Planning Commission recommended amending the S Overlay provisions to include the owner occupancy requirement because the provisions in their previous form were not adequately serving their stated goals. The planning commission concluded that preventing absentee landlords from dominating the Wasatch and Pleasant View neighborhoods would help to retain the neighborhoods' single-family character rather than converting them, in effect, to duplexes with both units often occupied by semitransient residents.

¶ 21 The objective of preserving the character of single-family residential neighborhoods is, we think, a legitimate one. *See City of Edmonds v. Oxford House, Inc.*, 514

U.S. 725, 732–33, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (referring to the benefits of such neighborhoods for purposes of "family values, youth values, and the blessings of quiet seclusion and clean air"). Moreover, we believe the municipal council could reasonably conclude that limiting accessory apartment rental to occupying owners would further this objective. The Owners have failed to persuade us that the distinction between an occupying owner who rents an accessory apartment to boarders, on the one hand, and an absentee owner who rents both the main dwelling and the accessory apartment, on the other, is meritless. Rather, the latter situation does appear, in effect, to transform a single-family residence into a duplex. In contrast, the presence on the property of the owner, who would maintain closer control over both the primary and the accessory dwelling units, would more likely mitigate this effect and tend to preserve the neighborhood's single-family residential character.

¶ 22 The cases cited by the Owners in support of their argument on this point are inapposite. In *College Area Renters & Landlord Ass'n v. City of San Diego*, 50 Cal.Rptr.2d 515 (Cal.Ct.App.1996), a California court invalidated on state equal protection grounds a zoning ordinance that limited the number of occupants in non-owner-occupied residences while placing no occupancy limit on owner-occupied residences in the same neighborhood, where the asserted goal was to reduce overcrowding. *Id.* at 521. The court concluded that there was not "a sufficient relationship between the non-owner-occupied classification and the overcrowding problem" because owner occupants were just as likely as renters to contribute to overcrowding. *Id.* Similarly, in *Kirsch v. Prince George's County*, 331 Md. 89, 626 A.2d 372 (1993), the Maryland Court of Appeals held invalid, under state and federal equal protection law, a zoning ordinance that imposed special restrictions, with the stated aim of reducing noise, litter, and parking congestion, only where the occupying renters were university students. *Id.* at 380 (holding

---

**6.** We need not consider whether we should apply heightened scrutiny in our analysis because the Owners concede, and we think it is clear, that the ordinance does not implicate a fundamental right or create a classification that is "considered impermissible or suspect in the abstract." *Gallivan*, 2002 UT 89 at ¶ 41, 54 P.3d 1069 (internal quotation omitted).

that "[t]o differentiate between permissible residential tenant classes by creating more strenuous zoning requirements for some and less for others based solely on the occupation which the tenant pursues away from that residence is that sort of arbitrary classification forbidden under our constitutions"). Both of these cases involved disparate burdens on the primary use of a residence based on arbitrary distinctions between owners and renters or between categories of renters.

¶ 23 Here, however, as indicated above, the S Overlay amendment places no burden on the primary use of Wasatch and Pleasant View houses as single-family residences, regardless of whether the occupying families are owners or renters. The amendment merely restricts who may engage in the secondary use of renting an accessory apartment. Moreover, unlike in *College Area Renters* and *Kirsch*, the distinction between occupying and nonoccupying owners for that purpose is, we have concluded, reasonably related to Provo's stated objective. *See Kasper*, 535 N.Y.S.2d at 624 (upholding against an equal protection challenge a zoning ordinance requiring owner occupancy as a prerequisite to renting an accessory apartment because the requirement furthered the goals of supplying affordable housing to renters and providing owners of limited means with rental income).

¶ 24 The Owners suggest that the amendment's definition of "owner occupancy," which requires an owner to be either a human being or a family trust, Provo City Code § 14.30.030(2)(d), unlawfully discriminates by excluding partnership or corporate forms of ownership. However, we believe such an exclusion is a legitimate means of preventing circumvention of the owner occupancy requirement. The Owners also suggest that the stated exception to the owner occupancy requirement for those owners who have "a bona fide, temporary absence of three years or less for activities such as temporary job assignments, sabbaticals, or voluntary service," *id.* § 14.30.030(c), amounts to discriminatory "religious tailoring." Regardless of whether Provo had in mind the maximum three-year missionary service of members of the Church of Jesus Christ of Latter-day Saints when formulating this exception, however, the exception by its plain language is not limited to LDS Church missionaries. It clearly applies to anyone who is away for vocational or voluntary service purposes, secular or religious, for three years or less. We thus perceive no basis in this language for holding the amendment invalid.

¶ 25 We therefore hold the amendment does not violate the Utah Constitution's uniform operation of laws provision.

## III.   RESTRAINT ON ALIENATION

¶ 26 The Owners also argue that the S Overlay amendment places an invalid restraint on alienation of properties located in the S Overlay zone because the restriction on accessory apartment rental will make it more difficult for owners of these properties to find willing purchasers. There is clearly no direct restraint on alienation here. *See Redd v. W. Sav. & Loan Co.*, 646 P.2d 761, 763 (Utah 1982) (explaining that direct restraints involve restraints contained in property conveyances or contracts). However, we have previously recognized that an indirect restraint on alienation " 'arises when an attempt is made to accomplish some purpose other than the restraint of alienability, but with the incidental result that the instrument, if valid, would restrain practical alienability.' " *Id.* at 764 (quoting L. Simes & A. Smith, *Law of Future Interest* § 1112 (2d ed.1956)). Arguably, a zoning ordinance may result in such an indirect restraint. *See Gangemi v. Zoning Bd. of Appeals*, 255 Conn. 143, 763 A.2d 1011, 1015 (2001) (invalidating a no-rental condition in a zoning ordinance as against the public policy favoring free alienability of property). As Provo points out, the ordinance at issue in *Gangemi* placed a total prohibition on renting and thus stripped single-family residential property owners "of essentially one-third of their bundle of economically productive rights constituting ownership." *Id.* at 1016 (recognizing in note 13 that "an owner's *economic* choices boil down to occupying, renting or selling" a residence). The Connecticut Supreme Court understandably considered this "a very significant restriction on the[ ] right of owner-

ship" and thus a significant encumbrance on alienability. *Id.*

¶ 27 Here, however, as we have already emphasized, owners in the Wasatch and Pleasant View neighborhoods retain the right to rent their primary residence. While restricting accessory apartment rental may impact property values, it is unclear whether this would be sufficient to consider the restriction a restraint on alienation. We need not decide this issue at this time, however, because even assuming the S Overlay amendment places an indirect restraint on alienation of property, we uphold the amendment as reasonably necessary to protect Provo City's justifiable and legitimate interest in preserving the single-family residential character of the affected neighborhoods. *See Redd,* 646 P.2d at 764.

## IV. RIGHT TO TRAVEL

¶ 28 The Owners further argue that the S Overlay amendment violates the constitutional right to travel that the United States Supreme Court recognized in *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). The Court in *Saenz* invalidated a California law creating classifications based on state citizens' duration of residency in the state, reasoning that such restrictions interfered with the right of every state's citizens to travel to and become a citizen of another state. *Id.* at 510. Based on this, the Owners claim that, because "[a] property owner who does not live in Provo and in the home may not rent the accessory unit/s[,] . . . . the owner may never move out of his or her home, whether it is down the block or out-of-state unless the [ ]owner can find someone in the limited pool of buyers who wishes t[o] purchase the home and live in the home and rent the accessory unit/s." We are unpersuaded that the S Overlay amendment has any impact at all on the movements of citizens from one state to another and decline to invalidate the amendment on this basis.

## CONCLUSION

¶ 29 In allowing property owners in some single-family residential zones near BYU to rent accessory apartments on condition that the owner resides in the primary dwelling, Provo has struck a balance between providing more housing alternatives and availability in these neighborhoods and preserving their single-family residential character. The provision at issue here places no restriction on owners' right to rent their primary residence but merely regulates a secondary use that could otherwise not be available at all. We hold that the owner occupancy requirement for accessory apartment rental is within Provo's zoning power, does not violate owners' constitutional rights to the uniform operation of laws, to equal protection, or to travel, and is not an invalid restraint on alienation. The district court's order of partial summary judgment and dismissal is therefore affirmed.

¶ 30 Associate Chief Justice WILKINS, Justice PARRISH, Justice NEHRING, and Judge LUBECK concur in Chief Justice DURHAM's opinion.

¶ 31 Having disqualified himself, Justice DURRANT does not participate herein; District Court Judge BRUCE LUBECK sat.